IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


MICHAEL ACE,                                   )
              Plaintiff,                         )
                             )
      vs.                                        )          Civil Action No. 14-526
                             )
ARMSTRONG UTILITIES, INC.,                     )
              Defendant.                         )


MEMORANDUM OPINION AND ORDER

Plaintiff, Michael Ace, brings this action against his former employer, Defendant

Armstrong Utilities, Inc. ("Armstrong"), alleging claims under the Americans With Disabilities

Act, 42 U.S.C. §§ 12101-12117 (ADA), and the Pennsylvania Human Relations Act, 43 P.S.

§§ 951-63 (PHRA). His Amended Complaint alleges that Defendant failed to accommodate his

disability, discriminated against him based on his disability and retaliated against him when he

supplied a doctor's note in support of his need for a quieter workspace, ultimately firing him

from his position as an inside sales agent on March 21, 2014.[1]

Presently pending before the Court is a renewed motion for summary judgment, filed by

Defendant, seeking dismissal of all of Plaintiff's claims. For the reasons that follow, the motion

will be granted with respect to Counts II, III, IV and V and the Rehabilitation Act claim in Count

I, and denied with respect to the failure to accommodate claims under the ADA and PHRA in

Count I.

---

[1] Plaintiff also alleged claims under the Family and Medical Leave Act of 1993, 29 U.S.C.
§§ 2601-54 (FMLA), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Section 510 of
the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1140 (ERISA). However,
in response to Defendant's motion for summary judgment, he concedes to the dismissal of these
claims (ECF No. 56 at 7 n.3).

Facts

Armstrong employed Plaintiff from 2007 through 2014 as an inside sales agent selling cable television, internet, and telephone services. His duties included taking inbound calls, selling cable television, internet, and phone services, answering customer questions about the offered services, and scheduling installation appointments. (Ace Dep. 76-77.)[2]

Inside Sales Supervisor Jason Spinetti was Plaintiff's supervisor from 2012 through Plaintiff's discharge. (Ace Dep. 20; Spinetti Dep. 13, 17, 19-20.[3]) Mr. Spinetti was supervised by Manager Bruce Jobe. (Spinetti Dep. 19.) Mr. Jobe was Plaintiff's Sales Manager from 2011 through Plaintiff's discharge. (Jobe Dep. 12-13, 15.)[4]

The sales department has an open space floor plan. The agents' desks are configured like a hockey rink. (Ace Dep. 180-81, 188 & Exs. 50-51.) Armstrong keeps the sales agents together in the oval space because commissions can be sensitive, and the sales agents are Armstrong's only commissioned employees. (Spinetti Dep. 189.) Plaintiff notes that at least one sales agent was permitted to sit around the corner in a full cubicle. (Ace Dep. 181; Spinetti Dep. 189.)

Plaintiff's Medical Condition

In August 2011, following a seizure that required hospitalization, Plaintiff was diagnosed with a cancerous brain tumor. (Ace Dep. 292; ECF No. 58 Ex. O (September 20, 2011 Doctor's Letter).) Since that time, Plaintiff has experienced increased fatigue, oversensitivity to bright lights, oversensitivity to loud noises, and an inability to "filter" between different sources of

---

[2]Unless otherwise indicated, all citations by Plaintiff to his own deposition are in his Appendix (ECF No. 58) Ex. A and all citations by Defendant (and the exhibits thereto) are in its Appendix (ECF No. 54) Ex. A.
[3]Unless otherwise indicated, all citations by Plaintiff to Spinetti's deposition are in his Appendix (ECF No. 58) Ex. B and all citations by Defendant are in its Appendix (ECF No. 54) Ex. B.
[4]Unless otherwise indicated, all citations by Plaintiff to Jobe's deposition are in his Appendix (ECF No. 58) Ex. C and all citations by Defendant are in its Appendix (ECF No. 54) Ex. C.

sound. (Ace Dep. 290.) As further explanation of Plaintiff's inability to "filter" different sounds, if he is sitting in a public restaurant and having a conversation with the person across from him, he has difficulty distinguishing between the conversation he is having and the conversations that other people are having at other tables. (Ace Dep. 290.) These symptoms have gradually gotten worse since Plaintiff had the seizure in 2011. (Ace Dep. 290-91.)

Notwithstanding these symptoms, Plaintiff was qualified to perform the essential functions of his job as a sales agent, so long as he was seated in a quiet enough workspace. (Spinetti Dep. 27-28; Ace Dep. 288.) Between August 2011 and December 2013, Plaintiff maintained employment with Armstrong and performed the essential functions of his job as a sales agent. (Spinetti Dep. 27-28.)

Between August 2011 and December 2013, Plaintiff intermittently took time off work to obtain treatment for his brain cancer. (Ace Dep. 38, 50, 52, 53.) Plaintiff was never required to seek the approval of Supervisor Spinetti or Manager Jobe in order to take a day off work for medical treatment. (Ace Dep. 45-47; Walker Dep. 14, 19-20.[5]) Because Armstrong's FMLA and sick-day programs were administered by others, neither Mr. Spinetti nor Mr. Jobe was ever called upon to decide Plaintiff's request for leave to obtain medical treatment—they simply needed to accept whatever decision had been rendered. (Spinetti Dep. 125; Jobe Dep. 91.)

Plaintiff's Request for Accommodation in December 2013

In December 2013, Plaintiff asked Supervisor Spinetti to relocate him to a quieter seat. (Ace Dep. 182; Spinetti Dep. 195-96.) Plaintiff told Mr. Spinetti that "the doctor [said] that it would be beneficial to him to have a quieter area, if possible." (Spinetti Dep. 196.) Mr. Spinetti knew that Plaintiff suffered from brain cancer and assumed that Plaintiff's request for a quieter

---

[5]All citations by Plaintiff to Jeff Walker's deposition are in his Appendix (ECF No. 58) Ex. D and all citations by Defendant (and the exhibits thereto) are in its Appendix (ECF No. 54) Ex. D.

workspace was being made based on his brain cancer. (Spinetti Dep. 195-96.) Mr. Spinetti was Plaintiff's manager and had the authority to satisfy Plaintiff's request by reassigning desk spaces. (Spinetti Dep. 190; Jobe Dep. 118.)

At that time, Plaintiff sat at a desk without any walls to block out the noise of other sales agents around him. (Ace Dep. 188.) Armstrong states that pictures of the area show that Plaintiff's desk had half walls. (Ace Dep. Ex. 51.) Plaintiff specifically stated that he would prefer to be placed in a full cubicle. (Ace Dep. 183.) At that time, in the same office space where Plaintiff and the other sales agents worked, there were two rows of full cubicles—i.e., workdesks bordered by walls that can block out the noise of other employees in the area. (Ace Dep. 183; Spinetti Dep. 188-89, 192.) Because the full cubicles have walls, they are quieter than the other workspaces in the office space where Plaintiff worked. (Ace Dep. 183; Spinetti Dep. 192.)

The only obstacle to relocating Plaintiff to a full cubicle was that, according to Mr. Spinetti, the sales agents' commission-based pay system is "a bit sensitive, so we kind of keep the sales folks all together." (Spinetti Dep. 189.) In the past, however, other sales agents had been allowed to sit in the full cubicles. (Spinetti Dep. 189.) At that time, there were full cubicles available, and Plaintiff could have been relocated to one of them. (Ace Dep. 296.)

Seat assignments in the sales area were changed two or three times per year to build camaraderie and a team environment. Plaintiff agreed to wait to be moved until the next scheduled seat rotation in January 2014. (Ace Dep. 181-82; Spinetti Dep. 190-9l.)

Plaintiff's Relocation

In January 2014, Plaintiff was relocated to a desk (not a full cubicle) located near a break area that could be used by all of the employees who worked in Plaintiff's office space—more

than 35 employees total. (Ace Dep. 192; Hassa Dep. 36[6]; Pott Dep. 16[7]; Spinetti Dep. 192, 206-08.) The break area contained a television that was on throughout the day. (Ace Dep. 183; Spinetti Dep. 210.) Employees watched a variety of shows on the television, including, for example, college basketball tournaments, talk shows, the news, and even game shows. (Spinetti Dep. 209-10.) There was no physical barrier between the break area and Plaintiff's desk (Spinetti Dep. 211), and both the television and the employees watching it were audible from where Plaintiff sat (Ace Dep. 182-83, 200-02; Hassa Dep. 36). On some occasions, multiple employees watched the NCAA college basketball tournament (i.e., "March Madness") with the volume on, right next to where Plaintiff was sitting. (Ace Dep. 200-01; Spinetti Dep. 209.)

There was an aisle to the left of him. Mr. Spinetti and Mr. Jobe stated that they thought that a desk with an aisle next to it would be a quieter location. (Ace Dep. 190; Spinetti Dep. 181, 191, 201; Jobe Dep. 119.) Mr. Spinetti and Mr. Jobe also placed a quieter agent on the right side of Plaintiff. (Spinetti Dep. 201; Jobe Dep. 119.) The desk also had an aisle in front of it. (Ace Dep. 190; Jobe Dep. 119.) Plaintiff notes that the desk was part of an oval-shaped arrangement, like a hockey rink, so all of the desks had an aisle in front of them. (Ace Dep. 190, 192.) Mr. Spinetti stated that there is usually only one person sitting in the breakroom, if any, because breaks and lunches are scheduled so that only one person is on break at a time. (Spinetti Dep. 207.) Plaintiff responds that Mr. Spinetti does not monitor what occurs in the break area with sufficient precision to say what "usually" occurs there. (Spinetti Dep. 208-09.) Moreover, Mr. Spinetti himself testified that people "have conversations with one another in [the] break area."

---

[6]Unless otherwise indicated, all citations by Plaintiff to Dana Hassa's deposition are in his Appendix (ECF No. 58) Ex. F and all citations by Defendant are in its Appendix (ECF No. 54) Ex. F.

[7]All citations by Plaintiff to Justin Pott's deposition are in his Appendix (ECF No. 58) Ex. I and all citations by Defendant are in its Appendix (ECF No. 54) Ex I.

(Spinetti Dep. 27.) Mr. Jobe likewise testified that he personally talks to other employees in the break area. (Jobe Dep. 121.) As for the comment that breaks and lunches are scheduled so that only one person is on break at a time, Mr. Spinetti made that statement (which was merely an expression of a "goal") only with respect to the 15 to 17 sales agents he supervises, whereas an additional 15 or 20 other employees in the workspace also use the break area. (Spinetti Dep. 207-09.)

Armstrong states that the television set is about twelve to thirteen inches, and Mr. Spinetti believed that the volume does not have to be very high because people are sitting close to it. (Spinetti Dep. 210.) Plaintiff responds that the television was not normally or usually on a low setting; the television is on throughout the day, and employees watch a wide range of programming, with the sound on. (Spinetti Dep. 209-11; Ace Dep. 192, 200-01; Hassa Dep. 36; Pott Dep. 16.) Mr. Jobe did not think that the sound on the television was permitted to be on in that area. (Jobe Dep. 121-22.) Even if the television was on, Mr. Spinetti did not think that Plaintiff could hear the television from where he was sitting. (Spinetti Dep. 210.) Plaintiff points out that Mr. Spinetti did not sit as close to the break area as Plaintiff did (Spinetti Dep. 207), and there is no record evidence that Mr. Spinetti did anything to determine whether Plaintiff could hear the television set from where he was sitting. The only two deponents with personal experience sitting in the seat (Plaintiff and Ms. Hassa) both testified that the television set was audible from the seat. (Ace Dep. 192; Hassa Dep. 36.)

Specifically, Ms. Hassa gave the following testimony:

Q. Do people watch television on the TV in the break area?
A. Occasionally.
Q. Do they watch television with the volume on?
A. Yes.
Q. Have you ever sat at a desk that is located near the break area?
A. Yes.

6

> Q. Have you been able to hear the volume from the television from where you
> were sitting at that desk?
> A. No.
> Q. Never?
> A. I would say rarely. I'm sorry. The TV is so small, and it's usually turned
> down that I could block it out if it is on.
> Q. But there are times that you were sitting at a desk near the break area and could
> hear the volume of the television, right?
> A. I could hear it, yes, yes.

(Hassa Dep. 36.) Plaintiff could not block out the sound because of his disability. (Ace Dep. 290.)

Armstrong notes that Plaintiff never asked anyone to turn the television off. (Ace Dep. 183.) Plaintiff believed it would not be "fair" to his co-workers to require that the television be off during their breaks, even if he was bothered by the noise. (Ace Dep. 183.)

Plaintiff felt that the desk to which he was relocated in January 2014 was the single loudest desk in the entire office space where he and the sales team worked. (Ace Dep. 192.) Mr. Spinetti testified that he relocated Plaintiff to that location because he and Mr. Jobe "felt [it] was a good place for [Plaintiff] to be." (Spinetti Dep. 191.)

On the day he was relocated next to the break area, Plaintiff told Mr. Spinetti that his new workspace was not acceptable because it was even noisier than where he'd been seated before. (Ace Dep. 184.) He states that Mr. Spinetti said he'd see if any of the other sales agents were willing to move for him. (Ace Dep. 184.) Mr. Spinetti did not recall Plaintiff saying that the new location was not quiet enough. (Spinetti Dep. 203-04.) More than two weeks later, Mr. Spinetti had not circled back with Plaintiff about his request, and Plaintiff was still seated at the desk next to the break area. (Ace Dep. 184.)

<u>Armstrong's Sales Process</u>

Armstrong states that inbound sales agents are instructed to ask customers questions to determine the appropriate services for that customer. (Ace Dep. 78.) Plaintiff responds that sales agents are not required to ask any questions in particular and that sales agents are not required to ask any questions at all when the customer communicates the information needed for the call in another manner. (Hassa Dep. 43; Spinetti Dep. 145.) He indicates that sales agents are not instructed merely to determine what services are "appropriate" for a customer and then sell those: Armstrong wants its sales agents to sell "from the top down," meaning to start with higher end packages and then pare down as necessary to close the sale. (Ace Dep. 232-33; Toomey Dep. 23.[8]) Armstrong also wants sales agents to "upsell" customers in order to increase sales of "[h]igher priced or additional services." (Hassa Dep. 48-49; Spinetti Dep. 174-75.)

Armstrong states that, according to Plaintiff's supervisor and manager, after an order is complete, customers should know what they are receiving "from top to bottom." (Spinetti Dep. 231; Jobe Dep. 52-53.) Plaintiff points to other testimony denying that customers must be given an itemized breakdown of each product and service that they will receive in a multi-item purchase. (Spinetti Dep. 46-47; Ace Dep. 249; Hassa Dep. 46.) Mr. Spinetti and Mr. Jobe clarified that a customer should be "aware" of, and have a "basic level of knowledge of," what they are going to receive after their order is complete. (Jobe Dep. 205; Spinetti Dep. 40.) But Armstrong sales agents are not required to give an itemized breakdown of each product and service that a customer will receive in a multi-item purchase. (Spinetti Dep. 46-47; Ace Dep. 249; Hassa Dep. 46.) Armstrong sales policies specifically instructed sales agents to "Use total

---

[8]Unless otherwise indicated, all citations by Plaintiff to Marcie Toomey's deposition (and the exhibits thereto) are in his Appendix (ECF No. 58) Ex. G and all citations by Defendant (and the exhibits thereto) are in its Appendix (ECF No. 54) Ex. G.

bill format when discussing pricing" of multi-item purchases. (Ace Dep. 150; Hassa Dep. 46; see also Spinetti Dep. 46-47; Jobe Dep. 197.)

When adding television services to an account, Mr. Jobe expects that sales agents will inform the customer of the name of the television package, the channels included in that package, the cost associated with each package, the equipment they will receive, and the cost of the equipment. (Jobe Dep. 55-57.) Plaintiff responds that, per Armstrong sales policies, when a sales agent adds television services to a customer's account, the customer needs to be aware of the general range of the channels that will be available, the television equipment they will receive, and the total price of the equipment and services in "total bill format." (Toomey Dep. 6; McKindley Dep. 41[9]; Jobe Dep. 197, 204-05; Ace Dep. 228.) Armstrong replies that sales agent Pott stated that "total bill format" means giving the customer the total price of a group of services in addition to giving the itemized breakdown of each service. (Pott Dep. 64.)

Armstrong offers several television packages. For example, the "Variety" package is a group of approximately forty (40) channels, while the "Extra" package has twelve to fifteen additional channels. The combination of those two packages is called a "Value Pack." (Ace Dep. 80.) Armstrong also sells premium television channels such as HBO, Showtime, Starz, and Encore. (Ace Dep. 80.) A customer does not need to have Value Pack to obtain premium channels. (Ace Dep. 80; Jobe Dep. 281.)

The charge for certain television services is per television. When a customer adds those services to multiple televisions, the sales agent receives commission for each television. (Ace Dep. 91-92 & Ex. 21.) Armstrong states that, when selling internet services, agents must ask the

---

[9]All citations by Plaintiff to John McKindley's deposition are in his Appendix (ECF No. 58) Ex. E and all citations by Defendant are in its Appendix (ECF No. 54) Ex. E.

customers what they use the internet for in order to determine the right level of service. (Ace Dep. 81.)

Plaintiff responds that sales agents are instructed, generally, to ask a customer how the customer will use the internet before recommending a specific level of service to the customer. (Ace Dep. 81.) But if the customer communicates the required information in another manner, or the sales agent accurately quotes the speed and price of the internet services that the customer agrees to purchase, then the sales agent is not required to ask further questions or provide any further disclosure. (Hassa Dep. 43; Spinetti Dep. 145 ("Sometimes the customer divulges [the necessary] information up front."); McKindley Dep. 48-49.)

Armstrong offers three levels of residential internet service: Zoom Express, which is entry level; Zoom, which is mid-level; and Zoom Pro, which is the highest level. (Ace Dep. 89 & Ex. 21.) At the end of a sales call, the customer must approve the order. (Ace Dep. 96.) Plaintiff responds that a customer must express approval of the "total bill format" price that a sales agent provides at the end of a sales call. (Jobe Dep. 197; Hassa Dep. 46.) And a customer must also be "aware" of, and have a "basic level of knowledge of," the products that will be added as a result of the sales call. (Jobe Dep. 205; Spinetti Dep. 40.) But a customer does not have to express approval, one-by-one, of each product or service that will be added as a result of the sales call. (Jobe Dep. 197; Spinetti Dep. 46-47; Ace Dep. 237.) Plaintiff knew that Armstrong wanted sales agents to tell customers if the quoted price was a special price that would expire. (Ace Dep. 98.)

Sales agents must enter work orders for every new service sold. Armstrong's sales software can autofill some parts of the work orders. Sales agents must click a "yes" button to confirm the services added on the order. (Ace Dep. 84.) Plaintiff denies that the work order must be created and completed by a single sales agent: if one sales agent creates a work order, then

another sales agent could edit the work order (and add services to that order) without creating a new work order. (Jobe Dep. 247; Ace Dep. 276, 298.)

Regardless of any automatic action by the system, the sales agents must type a description of the services that the customer ordered. (Ace Dep. 84.) Plaintiff responds that Armstrong's software program could automatically fill some parts of work orders and that regardless of Armstrong's automated system for filling in work orders, a sales agent must type in an abbreviated description (in coded format) of the services that a customer had ordered. (Ace Dep. 84.)

Agents were not allowed to add services to a customer's account without the customer's knowledge or consent. Doing so is considered "slamming." (Ace Dep. Exs. 22, 45.) Plaintiff received and agreed to follow Armstrong's "Sales Contract, Rules and Procedures for the Sales Department" (the "Sales Contract") which notified Plaintiff, in writing, that Armstrong would not tolerate "slamming." (Ace Dep. 99, 152-53 & Exs. 22, 45.) The Sales Contract defines "slamming" by stating that "changing a customer's existing service or adding additional services without the customer's consent will not be tolerated. This includes rolling products into a total balance without the customer being aware of what they are purchasing. Anyone caught 'slamming' will face progressive disciplinary action up to and including termination of employment." (Ace Dep. Exs. 22, 45.)

Sales agents, including Plaintiff, received a flat rate of pay, plus commission on services sold. (Ace Dep. 87.) Value Pack was the highest commission television package at $3 per sale. If a customer added Value Pack to more than one television set, the commission would be multiplied by the number of televisions the customer had. (Ace Dep. 204, 206.) Plaintiff notes that, in 2013 Armstrong increased the commission on the Value Pack to $3 specifically to

promote sales of Value Packs. (Ace Dep. 207-08; Spinetti Dep. 130-31.)

In mid-2013, Plaintiff did not typically have high Value Pack sales. For example, during the time period of July 7, 2013 through July 20, 2013, Plaintiff received commission for only one Value Pack sale, while other agents received commission for sixteen, fifteen, thirteen, and twelve Value Pack sales in the same time period. (Ace Dep. 209 & Ex. 54.)  From August 2013 through October 2013, Plaintiff was generally in the mid to low levels of Value Pack sales, with other agents sometimes doubling or even quadrupling the number of Value Packs Plaintiff sold during the same two-week periods. (Ace Dep. 211-12 & Exs. 56-59.)

Armstrong's Digital Adapter Rollout and Increases in Value Pack Commissions

Between October 2013 and March 2014, Armstrong's television subscribers were calling in to inquire about new equipment in advance of Armstrong's transition to a digital-only television signal. (Spinetti Dep. 215, 216, 219 (noting that Armstrong had given its customers "flyers and all kind[s] of stuff," telling them to "call us today" to "[g]et your adapters").) Plaintiff states that he was just one of many sales agents whose television commissions increased substantially during the period of October 2013 through March 2014 due to an influx of calls related to Armstrong's rollout of digital adapters. (Spinetti Dep. 215, 216, 219; ECF No. 58 Ex. M (CSC Commission Reports).)  Armstrong responds that the commission reports show that, other than Plaintiff's spike in Value Pack commissions, sales of television packages remained relatively steady among sales agents.

Plaintiff cites the example of one sales agent (labeled "Employee 16" in this litigation), who had Value Pack commissions of 7, 9, 7, 13, and 10 in the two-week periods between July 7, 2013 and September 28, 2013 but who, in two-week periods between October 2013 and March 2014, earned Value Pack commissions of double and triple these amounts, earning commissions

of 28, 27, and 31 (twice) in that period. (ECF No. 58 Ex. M.) Similarly, another sales agent (labeled "Employee 15" in this litigation), made fewer than 10 Value Pack commissions all two-week periods except one between July 7, 2013 and September 28, 2013, but, between October 2013 and March 2014, Employee 15 earned more than 10 Value Pack commissions in every single two-week period, and earned more than 20 commissions in multiple periods. Armstrong responds that Plaintiff went from selling one Value Pack from July 7 – July 20, 2013, to reaching sales of 24, 42, and even 50 Value Packs – more than twice the number of Value Packs sold by any other agent in the relevant time period, and almost 20 more than Employee 16 ever sold, almost 30 more than Employee 15 ever reached.

During the two-week period starting on October 13, 2013, Plaintiff received commission for the most Value Packs he had sold for several months: twenty four. (Ace Dep. 213 & Ex. 60.) After that point, Plaintiffs Value Pack sales increased dramatically. Plaintiff received commission for twenty-seven Value Packs from October 27 through November 9, 2013, and then forty-two Value Packs from November 10 through November 23, 2013. (Ace Dep. 216-17 & Exs. 62-63.)

Plaintiff's sale of Value Packs continued to increase, reaching a commission high of fifty during the week of December 8 through December 21, 2013. (Ace Dep. 219 & Exs. 64-65.)

Plaintiff responds that other sales agents also enjoyed large increases in their Value Pack sales during Armstrong's roll-out of digital adapters. Furthermore, as Mr. Jobe testified, it is common for sales agents to have disparate commission statistics, even widely disparate commission statistics: "[T]hat happens. That could happen from time to time, if an agent has a very good week or works overtime." (Jobe Dep. 123.) By comparison, the agent with the next highest sale of Value Packs in that two-week period sold only twenty-one: less than half of

Plaintiff's sales. Ace Dep. 219 & Ex. 65.) Plaintiff continued to be the sales agent with the highest, by far, sale of Value Packs in the sales department until his discharge in March, 2014. (Ace Dep. Exs. 66-71.)

Armstrong states that the dramatic change in Value Pack sales caused Mr. Jobe to wonder if there was an issue with Plaintiff. Mr. Jobe believed that such a spike could happen on occasion, but the pattern Plaintiff was showing required more investigation. (Jobe Dep. 123, 168-69.) Mr. Jobe states that he asked Mr. Spinetti to monitor Plaintiff's calls for anything out of the ordinary in order to figure out why Plaintiff's Value Pack sales were so much higher than anyone else's. (Jobe Dep. 124-25.)

Plaintiff responds that there is no evidence of an investigation of his Value Pack commissions until after Plaintiff handed Mr. Jobe a doctor's note on March 7, 2014: the first time Mr. Spinetti became aware of any improper Value Pack sales by Plaintiff was, according to Mr. Spinetti, on or around March 6, 2014, when he listened to a phone call taped by Ms. Toomey. (Spinetti Dep. 225.) Contrary to Mr. Jobe's testimony that he instructed Mr. Spinetti to monitor Plaintiff's calls and to figure out why Plaintiff's Value Pack sales were so high (Jobe Dep. 124-25), Mr. Spinetti did not listen to any calls specifically to investigate Value Pack sales until after March 7, 2014. (Spinetti Dep. 214-16, 221, 224, 225; Toomey Dep. 27, 62-63.)

Mr. Jobe states that, by simply listening to the calls, Mr. Spinetti was not able to identify anything out of the ordinary. (Jobe Dep. 124-25.) Mr. Jobe states that, at that time, Armstrong could not determine whether there was in fact misconduct or if there was another explanation they had not yet figured out. Without evidence that Plaintiff was committing wrongdoing, Mr. Jobe simply continued to monitor Plaintiff's commissions to see if they could figure out an

explanation for the anomaly. (Jobe Dep. 126-27.) Plaintiff responds that Armstrong improperly cites Mr. Jobe's hearsay testimony to establish what Mr. Spinetti concluded.

The January 27, 2014 Coaching Session

As part of his regular practice, Supervisor Spinetti conducts "coaching sessions" with sales agents during which he might play one of the agent's recorded calls, review how the call was scored under Armstrong's 360 program and discuss the call, both what was positive or missing from the call. (Ace Dep. 104.) On January 27, 2014, Mr. Spinetti convened a coaching session with Plaintiff to discuss Armstrong's policies and procedures for rolling out digital television adapters, which would be necessary to receive television service from Armstrong after a specified date when Armstrong was going to cease its analog television transmissions. (Spinetti Dep. 214-16, 219.) Around the same time, Mr. Spinetti had similar conversations about the digital adapter rollout with other sales agents. (Spinetti Dep. 215.) The January 27, 2014 coaching session was not about possible slamming or adding products and services to customer accounts without their consent. (Spinetti Dep. 214, 221, 225.)

Armstrong contends that Mr. Spinetti had a discussion with Plaintiff regarding the "importance of never selling any kind of equipment when the [customer] isn't ready for the equipment." (Ace Dep. 153, 155, 163 & Ex. 46.) Plaintiff responds that this conversation was not related to increased Value Pack sales or any potential misconduct by him. The coaching session was not about possible slamming or adding products and services to customer accounts. (Spinetti Dep. 214, 221.) This conversation was reflected in Plaintiffs Agent Development Log, or ADL, which was a record of disciplinary items and important conversations or coaching sessions that sales agents had with their supervisors. (Ace Dep. 153 & Ex. 46.)

During the January 27, 2014 coaching session, Plaintiff again asked Mr. Spinetti to be

moved to a quieter spot. (Ace Dep. 184.)  Mr. Spinetti did not indicate one way or the other as to whether he would grant Plaintiff's renewed request for a relocation. (Ace Dep. 184.)  Between January 27, 2014, and March 5, 2014, Mr. Spinetti neither relocated Plaintiff's workspace nor spoke with Plaintiff about any plan to do so. (Ace Dep. 184.)

The March 5, 2014 Call With L.M.

On March 5, 2014, Quality Assurance Manager Marcie Toomey reviewed a call between Plaintiff and customer L.M. (Toomey Dep. 44-47, 62 & Ex. 9.) Plaintiff notes Ms. Toomey reviewed the call as part of her routine review and evaluation of phone calls handled by Armstrong sales agents, not just phone calls taken by Plaintiff. (Toomey Dep. 63.) Ms. Toomey listens to approximately five calls for each of the fifteen to seventeen agents every two months, which averages to between four hundred and fifty and five hundred sales calls per year. (Toomey Dep. 36.)

Armstrong states that, during this call, Plaintiff did not ask probing questions and added internet service although it was clear that the customer did not understand Plaintiff when he asked her if she wanted "15 megs" and she responded "I guess."  (Toomey Dep. 44-47.) Plaintiff responds that he did ask probing questions, but, according to Ms. Toomey, there were "components [Plaintiff] missed" and there should have been greater clarification. (Toomey Dep. 45.)  Plaintiff denies that it was clear that the customer did not understand what he was asking when he asked whether "15 megs" would be sufficient for her internet service. (Hassa Dep. 22-23.) He further notes that he identified the speed and price of the internet service that was added, and the customer confirmed her acceptance of that speed and price. (McKindley Dep. 36-38; Hassa Dep. 22-23.)

Plaintiff also added five Value Packs to the account even though this channel package

16

was never discussed. (Ace Dep. 227-29, 233; Toomey Dep. 44-45.) Plaintiff admitted that he did not talk to L.M. about Value Packs but only discussed television services with premium channels.  (Ace Dep. 230; ECF No. 54 Ex. I, ARM000006.) Plaintiff denies that he added "five Value Packs" to the account: the "Value Pack" channel package was applied to all outlets on the account, which simply meant that all televisions in the home received that range of channels. (Ace Dep. 272.) He further denies that "this channel package was never discussed": When the customer called in, she said she wanted "three like basic, regular and then two HD DVR boxes." (Ace Dep. 231.) In context, the phrase "basic, regular" referred unambiguously to regular (i.e., non-High-Definition) television equipment; it did not refer to television channels. (Spinetti Dep. 252; Jobe Dep. 177; Ace Dep. 233.) The customer then asked twice for "all channels." (Spinetti Dep. 262-63, 265; Pott Dep. 54-56; Toomey Dep. Ex. 9.) To seek a clarification of what she meant by "all channels," Plaintiff asked whether she was referring to "just regular channels," or to both regular and premium channels. (Spinetti Dep. 262-63.) The caller clarified that she also wanted premium channels. (Spinetti Dep. 262-63.) Plaintiff understood the caller's requests for "all" channels to include all premium channels and Armstrong's full complement of standard, non-foreign, nonpremium channels (Ace Dep. 235), the latter of which corresponds to the "Value Pack" (Hassa Dep. 24, 25).

Ms. Toomey testified at her deposition that, during all her years reviewing thousands of sales calls, she had never heard an agent slamming a customer like she heard Plaintiff do in this call. This was the most blatant example of slamming she had ever heard. (Toomey Dep. 52-53.) Plaintiff notes that testimony is inconsistent with other record evidence. When Ms. Toomey first heard Plaintiff's call with customer L.M.—before this lawsuit began, and before she met with Armstrong's attorneys—she fully scored the call in all Armstrong 360 categories, inserted

comments, and finalized her evaluation. (Toomey Dep. Ex. 9.) The Armstrong 360 program is a

twelve-category evaluation system that Armstrong's quality assurance reviewers use to assess

sales agents' phone calls based on twelve different metrics. (Toomey Dep. 18; Dickerhoof Dep.

21.[10]) For each sales call, for each of the Armstrong 360 metrics, Ms. Toomey selects between

three possible scores: "Proficient," "Developing," and "Insufficient." (Toomey Dep. 38, 58 &

Ex. 8.) In her evaluation of Plaintiff's call with customer L.M., Ms. Toomey gave the call an

overall score of 300/360, with scores of "Proficient" in most categories. (Toomey Dep. Ex. 9.)

On the metric labeled "Be The Expert/Bridging" (which is associated with the agent's asking of

"probing questions"), Ms. Toomey scored the call as "developing"— not as "insufficient."

(Toomey Dep. 54.) On the metric labeled "Inform, recommend, troubleshoot and Be the Expert"

(which is associated with providing adequate information and disclosures to the customer), Ms.

Toomey scored the call as "developing"—not as "insufficient." (Toomey Dep. 54-55.) Ms.

Toomey explained that the "developing" score means that the agent has "gotten some of it right

but some of it needs further development." (Toomey Dep. 58-59.) Between March 2013 and

March 2014, more than 50 calls received the "developing" score in the "Be the Expert /

Bridging" category (Toomey Dep. 58 & Ex. 8), and more than 90 sales calls received the

"developing" score in the "Inform, recommend, troubleshoot and Be the Expert" category

(Toomey Dep. 58 & Ex. 8). In the same period, seven calls received a score of "insufficient" in

the "Be the Expert / Bridging" category, and nine calls received a score of "insufficient" in the

"Inform, recommend, troubleshoot and Be the Expert" category. (Toomey Dep. 58 & Ex. 8.)

Plaintiff indicates that, if his call with customer L.M. had really been a clear-cut example of

---

[10]All citations by Plaintiff to Terry Dickerhoof's deposition (and the exhibits thereto) are in his
Appendix (ECF No. 58) Ex. H and all citations by Defendant (and the exhibits thereto) are in its
Appendix (ECF No. 54) Ex. H.

slamming, Ms. Toomey would have scored the call accordingly.

Defendant replies that Ms. Toomey's testimony was unequivocal:

> Q. So this is clear-cut slamming?
> A. To me, yes.
> Q. You've reviewed a lot of sales calls over the years, right?
> A. Enough, yes.
> Q. Is this the most blatant example of slamming you're ever reviewed?
> A. Yes.
> Q. The single most blatant example of slamming?
> A. This is the only one that I've heard was a slamming call.

(Toomey Dep. 52.)  In response to Plaintiff's claim that Ms. Toomey had finalized the evaluation

and marked it as "Developing," Ms. Toomey explained that she saved the evaluation because she

was required to do so before in order to save her comments.  However, Ms. Toomey did not

want to give it a final rating until she spoke with Mr. Spinetti:

> A. I gave [him] the benefit of the doubt. When I listened to this call, the first thing that came to this call [sic] is there's something really wrong about what happened here.
> To me, the word that came to mind at the time was unethical, so I left it as it is before I had a discussion with Jason to see are your thoughts the same as mine on what happened here.
> So I saved it just to keep all the information, the data and the comments, but it was not altered after I scored it.
> [Ms. Toomey went on to explain that she wanted to give it an "I" for insufficient] but this particular call was very strange to me. Unethical is the term I thought of.
> I thought, wow, this call was really not appropriate, what happened here, but I left it as developing until when Jason and I had a discussion the following day.

(Toomey Dep. 56-57.)

Ms. Toomey Alerts Mr. Spinetti

On March 6, 2014, Ms. Toomey met with Plaintiff's supervisor, Mr. Spinetti, and asked

him to listen to the call. (Toomey Dep. 55-57, 62.)  Mr. Spinetti remembered listening to the call

flagged by Ms. Toomey, looking at the work order and noticing that Plaintiff added Value Pack

without discussing it with the customer. (Spinetti Dep. 227-28.)  Mr. Spinetti, like Ms. Toomey,

thought the call sounded like slamming. (Spinetti Dep. 227-29; Toomey Dep. 52-53.) Plaintiff contends that Mr. Spinetti did not think the call sounded like slamming at the time: at that time, Mr. Spinetti and Ms. Toomey believed that Plaintiff's call with customer L.M. could be "a mistake" by Plaintiff, requiring "further development." (Spinetti Dep. 241; Toomey Dep. 58-59.) Even according to Mr. Spinetti, he and Mr. Jobe did not reach any conclusion about "slamming" until they "listened to calls together" (Spinetti Dep. 241), which did not occur until Thursday, March 13, 2014 (Spinetti Dep. 242-43; ECF No. 58 Ex. M (Work Order Screenshots) at ARM000007-000008).

Mr. Spinetti told Ms. Toomey "not to touch" the evaluation and just leave everything as it was because he and Mr. Jobe would be investigating further. (Toomey Dep. 58 & Ex. 9.)

Armstrong states that Ms. Toomey spoke again with Mr. Spinetti on or about March 7, 2014 when Mr. Spinetti confirmed that both he and Mr. Jobe believed this was an example of slamming and that they were conducting an investigation. (Toomey Dep. 66, 68-70.) Plaintiff contends that the correct timeline follows: Ms. Toomey reviewed Plaintiff's call with customer L.M. on March 5, 2014. (Toomey Dep. Ex. 9.) The next day, on March 6, 2014, Mr. Spinetti visited Ms. Toomey's office to discuss her most recent review of the sales team's phone calls. (Toomey Dep. 27, 62-63.) During that conversation, Ms. Toomey notified Mr. Spinetti of the March 5, 2014 call that she had scored as "developing" (Toomey Dep. 63-64), which is what Ms. Toomey typically does, as part of her ordinary job duties, to enable Mr. Spinetti to "coach and counsel the agent" on areas that require further development (Toomey Dep. 43). The next day—Friday, March 7, 2014, after Plaintiff handed Mr. Jobe the March 6, 2014 Doctor's Note (Ace Dep. 185-86; ECF No 58 Ex. J)—Mr. Spinetti returned to Ms. Toomey's office and told her that "he was going to talk to Bruce" about the phone call. (Toomey Dep. 65.) However,

moments later, Ms. Toomey stated that what Mr. Spinetti told her in that second meeting was that he and Mr. Jobe were looking into the call and that she should not change the evaluation. (Toomey Dep. 67.)[11]  In a third meeting, Mr. Spinetti told her that he and Mr. Jobe "had listened to the call, that they agreed that they thought it was … a clear slamming incident, and they were taking it from there."  (Toomey Dep. 69.)

Defendant replies that Ms. Toomey did not speak to Mr. Spinetti because she heard a "developing" call, as she normally does to enable Mr. Spinetti to coach Plaintiff.  To the contrary, Ms. Toomey believed this was blatant slamming. (Toomey Dep. 50.)  Ms. Toomey also testified about why she asked Mr. Spinetti to come to her office on March 6, 2014:

> Q. Was he there to talk about all of the sales calls that you had been reviewing at that time?
> A. No. We were specifically talking about his group as a whole and how they were doing and specifically this particular recording.
> Q. So you were talking about his group as a whole and how they were doing and this specific recording?
> A. Yes.
> Q. Those two things?
> A. To the best of my recollection, yes.
> Q. And what did you tell Jason was the reason you wanted him to listen to the call?
> A. I said there's something really wrong with this call. I wanted his opinion on it. I said I have my own feelings about it, but I want him to listen to it and give me his own before I told him my thoughts on it.

(Toomey Dep. 63-64.)

Defendant asserts Mr. Spinetti heard that call with Ms. Toomey in her office on March 6, 2015. Then on or about March 7, 2015, Mr. Spinetti confirmed to Ms. Toomey that he and Mr. Jobe had already heard the call, "a clear slamming incident," and they were taking it from there. (Toomey Dep. 67-70.) Further, neither Mr. Jobe nor Mr. Spinetti testified regarding which days

---

[11]Def.'s Reply App. (ECF No. 64).

they reviewed Plaintiff's calls for their slamming investigation, although they both testified that there were two or more days. (Spinetti Dep. 229-32.) While some calls were recorded on March 13, 2014, it is undisputed both Mr. Spinetti and Mr. Jobe believed the call with L.M. was an example of slamming on March 7, 2014. (Toomey Dep. 69-70.) There is no evidence in the record regarding what time of day Mr. Spinetti spoke with Ms. Toomey, or what day Mr. Jobe and Mr. Spinetti jointly heard the call, although it was either March 6 or March 7, 2014. Ms. Toomey testified that she believed that this call was a blatant, clear-cut example of slamming because Plaintiff added services that were not clarified and were not explained to the customer at all; they were just added to the bill. (Toomey Dep. 51-52.)

Plaintiff Obtains a Doctor's Note

Meanwhile, Plaintiff took the day off work on March 6, 2014, in order to obtain a note from his oncologist. (Ace Dep. 302.) Plaintiff had decided to obtain the note because he believed that Mr. Spinetti would never follow through on Plaintiff's request for relocation. (Ace Dep. 184.) The note stated, "Given Mr. Ace's current medical condition I feel that he should have a workspace that is in a quiet area." (ECF No. 58 Ex. J.)

Plaintiff Exceeds His Sick-Day Quota

Plaintiff states that, with this day off on March 6, 2014, he had already taken a total of four sick days in 2014. (ECF No. 58 Ex. K (Excerpts of Plaintiff's Pay Records).) This fourth sick day brought Plaintiff just one day away from the maximum of five sick days that Armstrong allows its sales agents to take each year. (Spinetti Dep. 113.) Defendant responds that there is no evidence that Plaintiff's March 6, 2014 absence was considered to be a "sick day." There is no evidence that Armstrong counts pre-approved FMLA days as "sick days." To the extent that Plaintiff is implying that he had no more days available to take off for the year, Armstrong notes

that Plaintiff had been approved for FMLA leave for two days off every four months. (Ace Dep. 304.)  Further, Armstrong states that Plaintiff's pay stubs show that he was paid for 42 hours of sick time in 2013. (ARM 182-207.)[12]

Mr. Spinetti's and Mr. Jobe's ordinary practice is to take disciplinary action when a sales agent exceeds his or her five-day limit. (Spinetti Dep. 119-23; Spinetti Dep. 122 ("As soon as someone hits that number, we try to ADL it"—i.e., make a note of the sick leave on the agent's Agent Development Log. And "[i]f they go over again, further action is taken.").

Sales agents have been terminated for exceeding their 40 hours of sick leave before. (Spinetti Dep. 123.)  The 40-hour sick leave policy is not the only attendance-based policy that Mr. Spinetti and Mr. Jobe strictly enforce: they also require strict adherence to carefully planned work schedules, both in terms of what days are worked and when agents can take their breaks. (Spinetti Dep. 119-20; McKindley Dep. 28-29; Jobe Dep. 87-88.)  The driving force behind these strict policies is the same: as Mr. Jobe explained, "We have to achieve service level goals, and if we have too many agents off the phones or on vacation or sick, it makes it difficult to achieve those service level goals, which then becomes customer impacting." (Jobe Dep. 87-88; see also Spinetti Dep. 120 (noting that strict adherence to work schedules is required to maintain "a service level that [Mr. Spinetti and Mr. Jobe are] expected to achieve"); McKindley Dep. 29 ("They're strict because our business is very demanding. It changes and fluctuates frequently as calls, volume increases in different times.  Those positions need to be filled to make available for customer transactions.").)

To ensure the sales department can achieve these "service level goals," Mr. Jobe and Mr. Spinetti keep careful track of whenever an agent reaches his or her five-day limit, takes too long

---

[12]Def.'s Reply App. (ECF No. 64).

of a break, or misses a scheduled workday. (Spinetti Dep. 119-23.)  Defendant responds that

there is no evidence that Mr. Jobe "carefully scrutinized" or scrutinized at all any absences, sick

leave allotments, work schedules and work breaks.  Armstrong admits that Mr. Spinetti

monitored these leaves as part of his job as a supervisor – not Mr. Jobe.  (Spinetti Dep. 120.) But

it denies that Mr. Jobe scrutinizes sick leave allotments and work breaks at all. (Jobe Dep. 22-

23.) Moreover, Armstrong notes that Plaintiff's sick leave was overshadowed by his extensive

overtime hours – over 150 in 2013. (ARM 187-207.) Plaintiff had already accrued over a dozen

overtime hours in early 2014.

On a quarterly basis, Mr. Jobe is paid an incentive bonus for ensuring that the sales team

is available to answer a certain percentage of all calls placed to the sales department. (Jobe Dep.

22-23.)  Defendant responds that Mr. Jobe receives a quarterly incentive bonus based on four

metrics: percentage of calls taken by the sales team, save rate for the retention team, new

customer installations, close rate or the percentage of inside calls that result in work orders. The

maximum commission that Mr. Jobe could obtain from achieving all metrics is $2,000. (Jobe

Dep. 22-26.)

The way that Mr. Jobe can influence the sales team's call percentage is through "staffing"

and "schedules": i.e., "mak[ing] sure we have . . . the inside sales team available to take those

phone calls." (Jobe Dep. 23.)  Defendant responds that, to the extent that Plaintiff is implying

that FMLA leave or sick days have an impact on Mr. Jobe's bonus, said allegation is denied. Mr.

Jobe testified that Armstrong agents could receive five days of sick leave, as well as unscheduled

vacation time or unpaid sick leave time which they could take "whenever they want as long as

the hours are available for that day." (Jobe Dep. 86-87.)  It further notes that Mr. Jobe

specifically denied Plaintiff's misleading implication that an absence had an impact on his

commission.  In fact, counsel asked Mr. Jobe that question directly:

> Q. Does that mean your quarterly bonus is also affected when sales agents are out
> of the office or unavailable to take customer calls?
> A. Not necessarily. The thing that would affect it the most is the way the
> schedules are situated. For instance, if we had too many people working a day
> shift as opposed to a night shift, that would be a very good impact. An agent who
> calls off a day or who is out sick, that's very minimal impact. This is more about
> scheduling.
> Q. An agent who calls out sick unexpectedly would have little impact on it?
> A. Little impact because that would be one day, yes….
> Q. Because the things that affect your ability to make those sales percentage
> numbers are the scheduling of shifts?
> A. Scheduling of shifts is the primary function, yes….
> Q. If sales agents don't show up to work when they're scheduled to work, doesn't
> that frustrate the purpose of shift scheduling that was done?
> A. We would be down an agent. That's what it would do. There's ways to make
> that up. For instance, people can volunteer to work overtime, people already
> there. There's other ways. It really would be a case-by-case basis.

(Jobe Dep. 89-90.)

Mr. Jobe works hard to ensure he meets his quarterly targets "so [that] [he] can make the

most commission obviously. That's how [his pay] structure is built." (Jobe Dep. 25.)

<u>Armstrong's Response to the March 6, 2015 Doctor's Note</u>

When Plaintiff returned to work on Friday, March 7, 2014, he brought with him a hard

copy of the Doctor's Note he'd received the day before from his oncologist. (Ace Dep. 185-86;

ECF No. 58 Ex. J (March 6, 2014 Doctor's Note).)  At 9:00 a.m., Plaintiff used an Armstrong

scanner machine to scan and e-mail an electronic copy of the Doctor's Note to his work e-mail

account. (Ace Dep. 185.) Plaintiff then took the hard copy of the Doctor's Note to Manager

Jobe's office, handed the Doctor's Note to Mr. Jobe, and asked Mr. Jobe to relocate him to a

quieter workspace. (Ace Dep. 185-86.)  Mr. Jobe indicated that he would work on the relocation.

(Ace Dep. 186.)

According to Plaintiff, when he gave the doctor's note to Mr. Jobe, they had a very brief conversation. Plaintiff told Mr. Jobe "hey, just want to give you this. I'd like to be moved to a quieter spot..." (Ace Dep. 187.) Plaintiff testified that Mr. Jobe told Plaintiff "okay, we'll do that for you." (Ace Dep. 187.) According to Plaintiff, the request did not seem like a big deal. (Ace Dep. 187.) Plaintiff states that he also sent the doctor's note to Mr. Spinetti using his work email address on March 7, 2014. (Ace Dep. 185.)

Spinetti and Jobe Listen to Calls

Mr. Spinetti and Mr. Jobe listened to Plaintiff's calls because slamming is a "big deal" and they wanted to determine whether what they heard on the call with L.M. was a mistake or a pattern of behavior. (Spinetti Dep. 241; Jobe Dep. 134.) Plaintiff contends that Mr. Jobe and Mr. Spinetti listened to the calls because Mr. Jobe said they should conduct an investigation instead of speaking directly to Plaintiff. (Spinetti Dep. 246.)

Mr. Spinetti listened to Plaintiff's calls with Mr. Jobe. They identified a pattern of behavior when they cross-referenced what Plaintiff was saying to customers with what he was entering in their work orders. (Spinetti Dep. 241.) Plaintiff states that after listening to more than 30 of Plaintiff's phone calls, Mr. Jobe selected two calls that he later used to cause Plaintiff's termination for alleged slamming. (Dickerhoof Dep. Ex. 17 (describing the March 5, 2014 call with customer L.M., the March 13, 2014 call with customer B.T., and the March 13, 2014 call with customer N.W.).)

Armstrong cites Mr. Spinetti's testimony:

I had listened to the calls, and Bruce and I listened to calls together and determined that he was showing a pattern of behavior, because we cross referenced what he was saying to a customer with what he was actually entering on the order and we realized that they weren't jibing together correctly the way that they should be.

26

(Spinetti Dep. 225.)

The investigation took some time because not every call is a slamming opportunity. (Jobe Dep. 161, 281.) Plaintiff contends that the investigation was conducted over the course of a few hours on March 13, 2014, as demonstrated by the time stamps on the screen captures taken by Mr. Jobe. (ECF No. 58 Ex. M at ARM000007-000008.) Defendant replies the screen captures do not have the same dates and that both Mr. Spinetti and Mr. Jobe testified that they listened to "a lot" of calls over the course of two days. (Spinetti Dep. 242; Jobe Dep. 141.)

Mr. Jobe recalls that every time they heard Plaintiff add a digital adapter, he added services to that account without telling the customer. (Jobe Dep. 161.) Plaintiff notes that, on March 13, 2014, Mr. Jobe selected only two phone calls to support his report to Ms. Dickerhoof that Plaintiff was slamming. And one of the calls (the call with customer B.T.) involved the sale of internet only. Defendant replies that Mr. Jobe told Ms. Dickerhoof he had three examples of slamming. (Dickerhoof Dep. Exs. 15, 17, 18.)

On some of the calls with multiple television sets, Plaintiff would add Value Packs without telling the customer and then receive the commission of the Value Pack multiplied by the number of television sets that the customer had. (Jobe Dep. 162-63.) Plaintiff contends that Mr. Jobe's vague account of his recollection of Plaintiff's phone calls is neither accurate nor reliable. As noted above, on March 13, 2014, Mr. Jobe selected only two phone calls to support his report to Ms. Dickerhoof that Plaintiff was slamming. Only one of those calls involved a customer with multiple television sets who was calling about television products and services. Defendant replies that Plaintiff relies solely on the March 13, 2014 email and his description of it is incorrect. Three calls are described on the March 13, 2014 email regarding slamming – two of those are regarding the addition of Value Packs. On Mr. Jobe's email of March 14, he described

27

yet another example of Plaintiff adding Value Packs without the customer's knowledge and receiving commission for the Value Packs times five television sets. (Dickerhoof Dep. Exs. 17, 18.)

Mr. Jobe felt that they had uncovered very blatant examples of slamming. (Jobe Dep. 175-76.) Plaintiff was the only employee Mr. Jobe has ever caught slamming customers. (Jobe Dep. 289.) Mr. Jobe and Mr. Spinetti found at least four calls where Plaintiff added services to a customer's account and without informing the customer. (Jobe Dep. 141-43; Ace Dep. Ex. 73; ARM000006-000009.)

Plaintiff notes that his kind of review was without precedent: Mr. Spinetti and Mr. Jobe had never before conducted this kind of targeted review of a single sales agent's phone calls. (Spinetti Dep. 244-45.)  Armstrong responds that it never had evidence of an agent slamming customers before.  (Spinetti Dep. 242-45.)

<u>Other Calls</u>

Mr. Jobe and Mr. Spinetti listened to a call between Plaintiff and customer B.T., a recently divorced single mother, who was inquiring about internet and cable services but was concerned about costs. (Ace Dep. 252 & Ex. 73.) Plaintiff never asked B.T. what she used the internet for (as he testified he was required to do). Plaintiff added "Zoom Pro" – the highest level of residential internet service – to B.T.'s account. (Ace Dep. 253.) Plaintiff denies that this was a "failure" of any obligation.  Plaintiff notes that: "Sometimes the customer divulges this information up front" in some way, "so the agent doesn't have to ask every question." (Spinetti Dep. 145.) And that is what happened on this call: When customer B.T. called in to ask for services, she informed Plaintiff that under her previous television and internet subscription (with Time Warner Cable) she paid $60 each month for internet. (Jobe Dep. 221.) As Manager Jobe

testified, Plaintiff could reasonably infer from this statement that the woman had a high-speed (non-basic) internet package from Time Warner and would be getting a good deal for the same high-speed service from Armstrong. (Jobe Dep. 223-24.)

Armstrong replies that Plaintiff testified that he had to ask new customers what they used the internet for. (Ace Dep. 250.) There is no evidence that B.T. revealed up front what she used the internet for; she revealed what she previously paid for internet service in a different household when she was married. (Jobe Dep. 221.) Plaintiff's attempt to equate "non-basic" with "high-speed" is purposefully misleading since Mr. Jobe testified that there were cheaper "high-speed" internet services that Armstrong provided and that Plaintiff should have offered on this call. (Jobe Dep. 215-16.) Mr. Jobe testified that he did not think Plaintiff offered B.T. the best deal available on this call and that he believed Plaintiff slammed B.T. (Jobe Dep. 224-25.) Armstrong points out that B.T. stated she paid "$60 a month for Internet and basic cable." (Jobe Dep. 221.)

Armstrong states Plaintiff never notified B.T. that there were two lower options of internet service. (Ace Dep. 255.) Plaintiff also failed to tell B.T. he was giving her a promotional price for internet service that would expire in six months and that the cost of her internet would double, which according to Plaintiff, he was required to do. (Ace Dep. 255-56 & Ex. 25.) The higher level of internet service gave Plaintiff a higher commission. (Ace Dep. 257.)

Plaintiff responds that sales agents were not required to inform a customer of lower cost services or what those services would include—that would be down-selling, the exact opposite of what Armstrong expected of its sales agents. (Spinetti Dep. 270; Hassa Dep. 48 (noting that agents are instructed to "upsell" customers, not to "[downsell]" them).)

Manager Jobe considered this call to be slamming because, while B.T. knew she was

purchasing internet, she did not know the level of internet that she was purchasing. Armstrong had multiple levels of internet. However, Plaintiff led B.T. to believe she only had one choice for internet, which was incorrect. (Jobe Dep. 217-20.) Plaintiff contends that this testimony is inconsistent with other record evidence. Mr. Jobe himself conceded in deposition that Plaintiff reasonably inferred from customer B.T.'s prior internet subscription that she had a high-speed (non-basic) internet package from Time Warner and would be getting a good deal for the same high-speed service from Armstrong. (Jobe Dep. 223-24.) Plaintiff further notes that it was not improper for him to not inform customer B.T. of lower level internet services: as noted above, sales agents were not required to inform a customer of lower cost services or what those services would include—that would be down-selling, the exact opposite of what Armstrong expected of its sales agents. He notes that customer B.T. would obtain information about lower levels of internet by looking at Armstrong's website using information contained in her bill. (Hassa Dep. 72.) Armstrong replies that Mr. Jobe stated that Plaintiff was not giving this customer "the best deal" and that he consistently testified that B.T. was slammed. (Jobe Dep. 217-20, 223.) Armstrong's sales process required Plaintiff to determine what level of internet B.T. needed, and, if a cheaper high-speed internet would fit her needs, then that is what Plaintiff should have sold her. (Jobe Dep. 215-16.)

Plaintiff contends that sales agents are not required to ask any questions in particular. (Hassa Dep. 43; Spinetti Dep. 145.) Sales agents are not required to ask any questions at all when the customer communicates the information needed for the call in another manner. (Hassa Dep. 43; Spinetti Dep. 145.) Sales agents are not instructed merely to determine what services are "needed" by a customer and then sell those: Armstrong wants its sales agents to sell "from the top down," meaning to start with higher end packages and then pare down as necessary to close

the sale. (Ace Dep. 232-33; Toomey Dep. 23.) Armstrong also wants sales agents to "upsell" customers in order to increase sales of "[h]igher priced or additional services." (Hassa Dep. 48-49; Spinetti Dep. 174-75.)

Defendant replies that Plaintiff cannot deny that he testified he was required to ask questions like "do you have kids in the house, do they have video game systems, do you have laptops, how many devices?..." in order to determine what level of internet was appropriate for a given customer. (Ace Dep. 90-91.) It also states that Plaintiff's use of the term "upsell" is a red herring. Plaintiff cites to Ms. Hassa's testimony, without noting that she defined "upselling" as offering a customer a new service that they are not subscribed to when they call in asking for a specific product. (Hassa Dep. 48.) This is unrelated to the allegation regarding B.T. Ms. Hassa, for her part, thought Plaintiff slammed B.T. when he added the internet service on her account. Hassa Dep. 29.)[13] Plaintiff also cites to Mr. Spinetti's testimony, without acknowledging that Mr. Spinetti also testified that Plaintiff failed to ask the appropriate questions to determine the correct level of internet service on this call. (Spinetti Dep. 277[14]; see also McKindley Dep. 40 ("As a sales agent, you need to ask probing questions on what's appropriate for each customer situation.")

After comparing this call to the work order, Mr. Spinetti and Mr. Jobe confirmed that this was yet another example of Plaintiff slamming a customer. (Jobe Dep. 217-20; see also concurrence by Sales Agents McKindley, Pott and Hassa. McKindley Dep. 55; Pott Dep. 59-61; Hassa Dep. 31-32.) Plaintiff states that Quality Assurance Manager Toomey stated expressly that Plaintiff's call with customer B.T. was not an example of slamming. (Toomey Dep. 77-79.) Manager Jobe testified that Plaintiff had slammed customer B.T. by "rolling" a single product

---

[13]Def.'s Reply App. (ECF No. 64).
[14]Def.'s Reply App. (ECF No. 64).

into one total price (Jobe Dep. 218-19)—however, this explanation not only does not make sense (because a single service has only one price) but also was contradicted by Vice President Dickerhoof, who testified that an agent cannot improperly "roll up" products into a single price when a customer purchases only one product (Dickerhoof Dep. 42-43). Sales Agent Pott equivocated on whether this call was slamming under Armstrong's slamming definition by stating that "[e]veryone's opinion of slamming is different," because "[t]here's gray areas." (Pott Dep. 42.) Ms. Hassa testified that, based on listening to the call and reviewing the associated work order, she did not know whether Plaintiff intended to add services to the customer's account without the customer's knowledge (which is required for slamming, an intentional act), and she "would have just handled the call a little differently." (Hassa Dep. 33.)

Armstrong replies that Mr. Jobe testified extensively regarding his assessment that Plaintiff slammed B.T., which was not limited to a definition of "rolling" products. (Jobe Dep. 218-21.) Armstrong contends that, contrary to Plaintiff's mischaracterizations, Mr. Pott testified that based on the call and the work order, he would identify this specific call as evidence of slamming. (Pott Dep. 61.) Similarly, Ms. Hassa testified repeatedly that she believed Plaintiff slammed B.T. (Hassa Dep. 29, 32.) Mr. McKindley likewise agreed. (McKindley Dep. 55.)

Mr. Jobe, and perhaps Mr. Spinetti, listened to a phone call between Plaintiff and customer N.W. that occurred on March 13, 2014. (Jobe Dep. 162-63; Dickerhoof Dep. Ex. 17.) Customer N.W. called asking for digital adapters on eight televisions sets. (Ace Dep. 258.)

When asked if, based on the request for adapters, Plaintiff should have transferred that call to a different department, Plaintiff stated that, once customer N.W. stated that he did not often use a piece of equipment, he could explore the possibility of a change in the equipment. (Ace Dep. 259; Jobe Dep. 229-30.) Plaintiff recommended that N.W. downgrade a service that

32

the customer said he was not using. (Ace Dep. 259.) But he points out that he could not receive commissions for the adapters by keeping the call: the commissions for standard adapters was $0.00 at that time. (ECF No. 58 Ex. N (Commission Structure).)

Armstrong replies that Mr. Jobe's testimony regarding the downgrade that Plaintiff encouraged the customer to do was as follows:

> Q. Was it okay for Michael to talk about equipment changes with that customer after the customer said they don't watch the projector all the time?
> A. Was it okay? I wouldn't have done it. It's not something we would tell them to do. I don't think it's a big deal that he did that, but I wouldn't have done it.
> Q. There is some kind of policy that if someone calls in just for adapters that the sales agent should transfer that call somewhere?
> A. There was a policy. Since then, it's changed because we're a year after that, but the policy was to transfer that call yes.
> …
> Q. In this situation, once the customer said that they don't use the projector very often, Michael could explore the possibility of a change in equipment?
> A. He shouldn't. He could though.
> Q. This is not a big deal for you?
> A. Like I said, we would coach him on it. It's not a disciplinary issue at that point. So the reason why I say he shouldn't, we have a department that handles that. Any type of downgrades or disconnect of service, we have a completely different department that should go to. He technically shouldn't handle this call. Not because of the adapters, but because he's talking about downgrading services. That should go into our retention department. Is that a huge problem? No, but we would talk to him about it and tell him next time this call comes in to send it to retention.

(Jobe Dep. 229-30.)

Defendant admits that Plaintiff did not receive commission from the adapters; rather, he received commissions for the Value Packs that were added to his account without the customer's consent. (Ace Dep. 263-64.)

Armstrong states that, although the customer only requested adapters, the work order showed that Plaintiff also added an order for eight Value Packs. (Ace Dep. 260; ARM0007.)

Plaintiff responds that the work order screenshot that Armstrong produced for this phone call shows an order in process for "Extra Pack." (Ace Dep. 263; ECF No. 58 Ex. M (Work Order Screenshots) at ARM000008.) Based on the phone call with customer N.W., it would have been an error to add Extra Pack channels to customer N.W.'s account. (Ace Dep. 263, 298.) But record evidence suggests that Plaintiff never actually submitted an order for Extra Pack. The installation date for the work order at issue was March 21, 2014. (Ace Dep. 266.) If the work order produced by Armstrong (ECF No. 58 Ex. M at ARM00008 (top)) had actually been executed, then Plaintiff would have received commission on either 3 Value Pack and 6 Extra Pack (due to the combination of Extra Pack with the existing Variety Packs), or 9 Extra Pack (if there was no commission bump for combination with the existing Variety Packs). (See Ace Dep. 263 ("Q: And you would get commission on those 8 Value Packs? A: No, the Extra Pack. The Value Pack wasn't added. The Extra Pack was added.").) A review of Plaintiff's commission reports for the time period in question shows, however, that Plaintiff received only three (3) commissions for Extra/Variety Pack in that time period. (ECF No. 58 Ex. L (CSC Commission Reports).) Thus the evidence is that Plaintiff did not receive commissions for the Extra Packs on customer N.W.'s work order, meaning that the Extra Pack order was never completed. The reasonable inference is that Plaintiff was not finished reviewing and correcting as necessary the work order that Armstrong has produced for this call, perhaps because the screenshot was captured before Plaintiff finished the phone call itself. (Spinetti Dep. 69-72 (noting that sales agents typically input work order during the course of a call).) That inference is consistent with Plaintiff's testimony, in deposition, that the customer's phone number had not yet been inputted into the order, and that the customer's request for a "call ahead" had not yet been noted in the order. (Ace Dep. 261, 264.)

Furthermore, the work order comments "Add 8VAL" do not reflect an attempt by Plaintiff to add Value Pack to customer N.W.'s account. Customer N.W. had nine televisions in his house. (Ace Dep. 260, 263; ECF No. 58 Ex. M (Work Order Screenshots) at ARM000007.) Customer N.W. also already subscribed to Armstrong's "Variety Pack" cable channels. (Ace Dep. 260-63; ECF No. 58 Ex. M (Work Order Screenshots) at ARM0000007.) But not all of customer N.W.'s televisions had equipment that was compatible with a digital signal. So customer N.W. needed eight digital adapters, to ensure that his televisions would continue to receive channels after Armstrong transitioned to a digital-only television signal. (Spinetti Dep. 215.) But before customer N.W. could watch television on the new digital adapters, the adapters would need to be installed in customer N.W.'s residence. (Spinetti Dep. 215-16.) In preparation for that installation, Plaintiff needed to instruct the technician to confirm that customer N.W.'s existing channel package (the Variety Pack) was working on all 8 digital adapters. (See Ace Dep. 272.) Plaintiff therefore needed to write "Add 8VAR" in the comments section, as instructions to the technician to confirm Variety Pack service on the new adapters. Evidently Plaintiff accidentally wrote "Add 8VAL" instead of "Add 8VAR." But this was only an instruction to the technician (Ace Dep. 272) and Plaintiff did not intentionally "add[] an order for eight Value Packs."

Armstrong replies that Plaintiff's denial is unsupported by record evidence and does not allow for the conclusion arrived by Plaintiff. It remains undisputed that the work order entered by Plaintiff had the statement "add 8 Val," which Plaintiff testified under oath was "add 8 Value Packs." Plaintiff also testified that his description "add 8 Val" would not be hitting a wrong key, but it was something Plaintiff added. (Ace Dep. 267.) Plaintiff's "explanation" that he should have added "8Var" instead of "8Val" is not supported by the record evidence. Indeed, Plaintiff

35

cites to his deposition at p. 272 for support of this inventive theory, without noting that on p. 272 Plaintiff is testifying about a completely different call. (Ace Dep. 269-76 & Ex. 72.) Finally, Plaintiff cannot rely on his commission report to claim that he did not commit slamming. N.W. never asked for any cable packages. (Ace Dep. Ex. 77, ARM000007.) Plaintiff has provided no evidence, and in fact did not testify that, any cable services were requested or appropriate based on that call. Armstrong contacted N.W. to inform him that cable services had been added without his consent and asked whether he would like that charge removed from the account. (Dickerhoof Dep. Ex. 19.) Therefore, the absence of any specific commission is not evidence that Plaintiff did not add 8 Value Packs to N.W. without his knowledge or consent. Most importantly, Plaintiff cannot deny that Armstrong decided that this call showed Plaintiff adding an order for eight Value Packs without notifying the customer of this fact.

Plaintiff conceded that there was no reason for Value Pack to have been added to the work order. (Ace Dep. 263.) Plaintiff could not identify any reason why someone else would change the work order, other than to correct specific mistakes. (Ace Dep. 265.) Adding the "Value Pack" in the work comments section is not an accident where someone hit the wrong key. Plaintiff had to type that request specifically. (Ace Dep. 267; ARM000007.)

Plaintiff responds that the words "Value Pack" do not appear in the work order. The phrase "ADD 8VAL/1HDDTA/8SDDTA P/U HDSTB" appears in the work comments section. (Ace Dep. 263; ECF No. 58 Ex. M (Work Order Screenshots) at ARM000008.) Plaintiff notes that the phrase "8VAL" in the work order comments needed to be typed into the work order. But writing "Add 8VAL" instead of "Add 8VAR" is exactly the type of accident where someone hit the wrong key. Armstrong replies that he never testified that he made a mistake by adding "Add

8VAL" as opposed to "Add 8VAR" and the customer never requested any additional cable services. (Ace Dep. 268 & Ex. 77.)

Ms. Toomey, upon hearing this call at her deposition, identified this call as yet another example of Plaintiff slamming customers. (Toomey Dep. 96-97.) Based on her review of the work order, it was clear to Ms. Toomey that Plaintiff was the person who added Value Pack to N.W.'s account. (Toomey Dep. 96-97.) Ms. Toomey's evaluation conforms with Mr. Jobe's and Mr. Spinetti's determination that Plaintiff slammed customer N.W. on this call by adding eight Value Packs without discussing it with N.W. There would have been no reason to add a channel package on that account. (Jobe Dep. 231, 237-38.)

Mr. Jobe Reports to Ms. Dickerhoof

On March 13, 2014, Mr. Jobe reported this matter to his supervisor, Vice President for Customer Service and Billing Terry Dickerhoof, indicating that he had "an urgent personnel issue that might require us to terminate an employee." (Dickerhoof Dep. Ex. 15.) Ms. Dickerhoof recalls that she listened to at least one call where Plaintiff added Value Pack without telling a customer about it. (Dickerhoof Dep. 52-54.)

Ms. Dickerhoof's testimony was that she could not recall whether she heard specific calls (Dickerhoof Dep. 52-54). Nonetheless, Ms. Dickerhoof remembered not only listening to a call but also going through the call's corresponding work order screens. (Dickerhoof Dep. 57.) Ms. Dickerhoof also recalled listening to more than one call. (Dickerhoof Dep. 62-63, 95.)

> Q. At most, you listened to two calls, right?
> A. It could have been more.
> Q. It could have been more than two calls?
> A. Yes, sir. I think I listened to at least two.

Armstrong notes that it is undisputed that Ms. Dickerhoof received an email with two call recordings and corresponding screen shots. (Dickerhoof Dep. Ex. 17.) Armstrong states that Ms.

Dickerhoof testified that she asked Mr. Jobe to listen to other calls and make sure there was a pattern. (Dickerhoof Dep. 58-61.) Plaintiff denies that this testimony is consistent with other record evidence. The record shows that Ms. Dickerhoof did not listen to one of Plaintiff's phone calls and then instruct Mr. Jobe to listen to additional calls. As of March 12, 2014, the only alleged "slamming" call that had occurred was Plaintiff's March 5, 2014 phone call with customer L.M. (Spinetti Dep. 242-43; ECF No. 58 Ex. M (Work Order Screenshots) at ARM 000007-000009.) As of that date, Mr. Jobe had not yet notified Ms. Dickerhoof of his investigation into Plaintiff. (Dickerhoof Dep. 66.) On March 13, 2014, Mr. Jobe listened in real-time to Plaintiff's phone calls in order to search for evidence of slamming. (Dickerhoof Dep. Ex. 15; ECF No. 58 Ex. M (Work Order Screenshots) at ARM000007-000008.) Mr. Jobe selected two of Plaintiff's calls from that day to be used as a basis for terminating Plaintiff—specifically, the calls with customer B.T. and customer N.W. (Dickerhoof Dep. Ex. 15.) Later that afternoon, at 1:48 PM, Mr. Jobe sent an e-mail to Ms. Dickerhoof, stating that he had "an urgent personnel issue that might require us to terminate an employee." (Dickerhoof Dep. Ex. 15.) In the e-mail, Mr. Jobe stated that "I do believe what we have now is enough to separate employment," and that "[w]e have three accounts with recordings and screen grabs to prove this." (Id.) This was the very first time that Mr. Jobe notified Ms. Dickerhoof of his investigation into Plaintiff. (Dickerhoof Dep. 66.) Indeed, Ms. Dickerhoof responded by e-mail the next day at 7:13 AM to ask "Who is doing this." (Dickerhoof Dep. Ex. 15.) This timeline conclusively refutes Ms. Dickerhoof's testimony that she listened to one of Plaintiff's phone calls and then instructed Mr. Jobe to listen to other calls.

Armstrong replies that Mr. Jobe emailed Ms. Dickerhoof on March 14, 2014, attaching two slamming calls, then notified her of additional calls, so Ms. Dickerhoof's testimony that she

38

instructed Mr. Jobe to listen to more calls is undisputed. Nevertheless, Plaintiff is correct that Ms. Dickerhoof's memory of telling Mr. Jobe to listen to more calls is not corroborated by the email messages, in which Mr. Jobe gathered the evidence and then sent it to Ms. Dickerhoof. Nevertheless, Ms. Dickerhoof testified that she personally heard at least two calls, maybe more, and she did not believe there was any possibility that Plaintiff had simply made a mistake. Ms. Dickerhoof believes they had evidence of "blatant slamming" because they found examples of these "mistakes" happening more than once and more than twice. (Dickerhoof Dep. 93-95.)

　　　Ms. Dickerhoof also reviewed Plaintiffs commissions and noted that his sales for the Value Pack were really high. (Dickerhoof Dep. 61-62.) Plaintiff denies that this testimony is consistent with other record evidence. Ms. Dickerhoof testified that she reviewed Plaintiff's commissions before she signed off on his termination. (Dickerhoof Dep. 62.) But Ms. Dickerhoof was not aware that Mr. Jobe was investigating Plaintiff until March 14, 2014, when Mr. Jobe told her via e-mail that he was investigating Plaintiff. (Dickerhoof Dep. 66-67 & Ex. 15.) And then Ms. Dickerhoof, who was out of the office that day due to sickness (Dickerhoof Dep. Ex. 16 (noting that she was in the doctor's office when she received Mr. Jobe's e-mail)), signed off on Plaintiff's termination later that morning via e-mail from her cellular phone, while she was in the waiting room at the doctor's office (Dickerhoof Dep. Exs. 15-16; Dickerhoof Dep. 80 (confirming that the decision to terminate Plaintiff had already been made when Ms. Dickerhoof sent the 11:53 AM e-mail: "That's why I asked [Mr. Jobe] to talk to Jeff Walker earlier. It was a double-check.")).

　　　Plaintiff contends that there is no evidence in the record to suggest that Ms. Dickerhoof reviewed Plaintiff's commission reports between 8:14 AM (when Mr. Jobe identified Plaintiff as the person under investigation) and 11:53 AM when Ms. Dickerhoof signed off on Plaintiff's

termination (based solely on Mr. Jobe's summary e-mails to her) and requested the supporting documentation for submission to Armstrong's president, Mr. Ross. Plaintiff notes that, in her deposition, after setting forth a timeline that was directly refuted by the e-mail record, Ms. Dickerhoof stated that "I'm sorry. I do not recall everything I looked at. . . . . I know that I probably looked at sort of commissions to see if they were up and down, you know, on certain services." (Dickerhoof Dep. 62.) The fair conclusion is that Ms. Dickerhoof did not actually review Plaintiff's commissions, but instead relied on her department manager, Mr. Jobe, to make the decision on Plaintiff's termination, as the rest of the record shows.

Armstrong replies that Ms. Dickerhoof never testified that she signed off on Plaintiff's termination on March 14, 2014 while she was in the waiting room at the doctor's office. (Dickerhoof Dep. 61-62, 79-81.) Despite Plaintiff's tortured interpretation of short email communications, Ms. Dickerhoof testified that she asked Mr. Jobe to talk to Mr. Walker on March 14, 2014 because:

> when there's something of this serious magnitude, when you're charging slamming or theft, we would immediately involve HR before we even made a decision to terminate to get their feedback on it and provide them with calls and to get, in this instance, Jeff Walker's take to make sure we were looking at this and looking at it the right way.

(Dickerhoof Dep. 68.) Mr. Jobe, who received the email, also understood that Ms. Dickerhoof was asking for Mr. Walker's advice on the matter on March 14, 2014:

> ...I work with [Dickerhoof] every day and sometimes situations come up where I have to call Jeff [Walker].
> Normally, when I call Jeff [Walker], it is to get his advice on something, what should be done in a situation. So when I got this e-mail from Terry [Dickerhoof], that's exactly what I did. I called Jeff [Walker], gave him the situation and then got his advice about the situation and how he thought it should be handled.

(Jobe Dep. 148.)[15]

Armstrong states that, this explains why, on March 15, 2015, Mr. Jobe was following up with Ms. Dickerhoof regarding whether to terminate Plaintiff and three days later, on March 18, 2014, Mr. Jobe was reporting on two additional calls where Plaintiff was slamming customers. (Dickerhoof Dep. Exs. 17, 18.) It notes that these discussions regarding whether to terminate Plaintiff would make no sense if "the decision had been made" four days earlier. The emails show that Mr. Walker did not provide a final approval for Plaintiff's termination until March 19, 2014. (Walker Dep. Ex. 12.) Further, even Plaintiff's timeline does not rebut Ms. Dickerhoof's testimony that she reviewed Plaintiff's commissions and noted that his sales for the Value Pack were really high Ms. Dickerhoof believed they had uncovered a pattern of slamming and that Plaintiff had to be terminated because slamming is wrong, unethical and resulted in a higher commission. (Dickerhoof Dep. 46, 63-64.)

Call with D.M.

On March 15, 2014, Mr. Spinetti and Mr. Jobe found a fourth call, with customer D.M., where Plaintiff added services that the customer had not requested. Plaintiff denies that Mr. Spinetti listened to this call; the record shows that only Mr. Jobe listened to this call. (Dickerhoof Dep. Ex. 18.) He further denies that this phone call is material in any event: the decision to terminate him had already been made on March 14, 2014, before this phone call occurred. And he denies that he added any services that the customer had not requested. Armstrong replies that Spinetti and Jobe testified that they listened to all calls together (Jobe Dep. 141; Spinetti Dep. 241-43.)

---

[15]Def.'s Reply App. (ECF No. 64).

In this instance, customer D.M. called and asked to add a high-definition box with a high-definition recording device. (Ace Dep. 268.) Plaintiff admits that he did not discuss any television services on that call. (Ace Dep. 269.) Nonetheless, Plaintiff also added Value Packs to D.M.'s account. (Ace Dep. 269.) Plaintiff states that he did not testify that he added a Value Pack cable package to this customer's account. (Ace Dep. 269, 271-72.) In fact, Plaintiff did not add any new television channels to customer D.M.'s account: as Plaintiff attempted to explain in his deposition, the work order produced by Armstrong for this phone call is incomplete, and it does not show whether customer D.M. already had the Value Pack on her existing digital connections. (Ace Dep. 270-72.) Plaintiff also explained that the phrase "Add 6VAL" in the work order comments was an instruction to the technician to check the level of service (i.e., what channels are coming through) on all televisions where new equipment was installed. (Ace Dep. 272.) The comment "ADD 6VAL" therefore made sense on this call, because the customer was receiving a new HD-DVR box and five digital adapters, the latter of which were necessary to ensure that her existing televisions (which Plaintiff asked her about) would continue to receive a signal after Armstrong went to digital. (Ace Dep. 270, 272; see also Spinetti Dep. 216-17 (explaining that providing digital adapters for televisions that the customer confirmed they use is not slamming).) Moreover, Manager Jobe testified that "[i]f a customer called and they already had Value Pack on their account, it would not present an opportunity for Plaintiff to slam a customer on Value Pack." (Jobe Dep. 281.)

Armstrong replies that, when asked, Plaintiff admitted that he did not discuss any additional cable channels on the call, that he could not identify why he inputted that comment and that the only user ID that shows up on that screen is his name. (Ace Dep. 269-70.) During his deposition, Plaintiff had no explanation for why the work order said "Add 6 Value." He further

stated "It shouldn't say Value or Extra, based on the call." (Ace Dep. 272.) Despite Plaintiff's extensive explanations of what "could" have happened on the call, a review of Plaintiff's testimony (Ace Dep. 269-72) shows that Plaintiff continually admitted that the "Add 6 Value" should not be in there (e.g., could not explain why that was there, p. 270; should not have added Extra Pack or Value Pack or Variety at all based on the call, p. 271; "it shouldn't say Value or Extra based on the call," p. 272; work order review personnel would not have known that the customer did not ask for additional cable services, p. 274).

Plaintiff has no explanation as to why he added Value Packs to D.M.'s work order. He conceded that the only user ID seen on that work order was his own. (Ace Dep. 270, 276-77.) Plaintiff responds that the phrase "Add 6VAL" in the work order comments was an instruction to the technician to check the level of service (i.e., what channels are coming through) on all televisions where new equipment was installed. (Ace Dep. 272 ("Object to form. . . . [H]e already answered that.").)

Based on a simple comparison of the call between Plaintiff and D.M. and the corresponding work order entered by Plaintiff, Armstrong considered this an example of Plaintiff slamming a customer.  (Ace Dep. Ex. 73; ARM00009.)

The Final Steps

Before proceeding to terminate Plaintiff, Ms. Dickerhoof asked Mr. Jobe to consult with the Director of Human Resources, Jeff Walker. (Dickerhoof Dep. Ex. 19; Walker Dep. Ex. 12.) Plaintiff denies that Ms. Dickerhoof made the request before a decision had been made about his termination. (Dickerhoof Dep. 80.)

Mr. Walker first discussed the evidence for termination with Mr. Jobe.  Based on the information they had, Mr. Walker approved the termination on March 19, 2015. (Walker Dep.

70-71 & Ex. 12; Dickerhoof Dep. Ex. 19.) Plaintiff responds that Mr. Walker and Mr. Jobe did not discuss in detail the information supporting Mr. Jobe's decision to terminate. Mr. Jobe merely told Mr. Walker that he had evidence that a sales agent was deliberately adding services to customers' accounts without their consent. (Jobe Dep. 150-52; Walker Dep. 53-54.) Mr. Jobe did not supply Mr. Walker with the audio recordings or the work order screenshots. (Walker Dep. 66.) Mr. Walker did not listen to the phone calls or review the work orders before signing off on Plaintiff's termination. He just relied on the judgment of the sales department manager, Mr. Jobe. (Walker Dep. 53-54, 66.)

Armstrong states that, if Mr. Walker had believed that Plaintiff's termination was unwarranted, he could have interceded and stopped the termination as he has done for other employees in the past. (Walker Dep. 56-57.) Plaintiff admits that Mr. Walker had the corporate authority to intervene in Plaintiff's termination if he chose to do so. (Walker Dep. 56-57.) However, he claims that Mr. Walker did not engage in the detailed analysis necessary to intelligently exercise that authority with respect to Plaintiff's termination in particular. Whatever his theoretical authority may be, in this instance Mr. Walker just relied on the judgment of the sales department manager, Mr. Jobe. (Walker Dep. 53-54, 66.) Armstrong replies that this is unsupported.

On March 19, 2014, Vice President Dickerhoof requested the company President's approval of her decision to terminate Plaintiff for slamming, which he provided on March 20, 2014. Mr. Jobe and Ms. Dickerhoof coordinated the logistics of the termination meeting on that day. (Dickerhoof Dep. Ex. 19.) Mr. Jobe also testified "I do not make the call on the termination. That is between Terry [Dickerhoof], Jeff Walker, and it appears, based on this email that they would talk to [President] Jeff Ross about it." (Jobe Dep. 148.) Mr. Walker also testified that his

approval was necessary to terminate an employee. (Walker Dep. 54-55, 57.)

On March 21, 2014, Armstrong terminated Plaintiff's employment for slamming. The termination meeting was held by Manager Bruce Jobe and Supervisor Jason Spinetti. (Ace Dep. 278.) Plaintiff states that Mr. Jobe held the meeting and Mr. Spinetti simply sat in the room. (Ace Dep. 278.)

Procedural History

Plaintiff filed his complaint on April 22, 2014 and on December 22, 2014, he filed an Amended Complaint. Count I alleges disability discrimination and failure to accommodate in violation of the Rehabilitation Act, the ADA and the PHRA. Count II alleges retaliation in violation of the Rehabilitation Act, the ADA and the PHRA. Count III alleges a discriminatory discharge in violation of the Rehabilitation Act, the ADA and the PHRA. Count IV alleges retaliation in violation of the FMLA. Count V alleges interference with his rights under ERISA.

On June 30, 2015, Defendant filed a motion for summary judgment (ECF No. 35). Plaintiff filed his response in opposition on July 13, 2015 (ECF No. 44) and on August 7, 2015, Defendant filed a reply brief (ECF No. 48).

On October 15, 2015, a Memorandum Opinion and Order was entered (ECF No. 51), which dismissed the motion for summary judgment, the response and reply, and all documents associated therewith for failing to comply with the Federal Rules of Civil Procedure, this Court's Local Rules and the practices and procedures of the undersigned. A new briefing schedule was entered, pursuant to which Defendant's renewed motion for summary judgment was filed on November 12, 2015 (ECF No. 52), Plaintiff's brief in opposition was filed on December 2, 2015 (ECF No. 56) and Defendant's reply brief was filed on December 16, 2015 (ECF No. 59).

As noted above, Plaintiff concedes to the dismissal of his claims under the FMLA (Count IV), ERISA (Count V) and the Rehabilitation Act (as alleged in Counts I, II and III). Thus, the remaining claims in this case are failure to accommodate in violation of the ADA and PHRA (Count I), retaliation in violation of the ADA and PHRA (Count II) and discriminatory discharge in violation of the ADA and PHRA (Count III).

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

46

Defendant argues that: 1) Plaintiff cannot state a prima facie of failure to accommodate discrimination because he admits that he was told he would be moved, he cannot contend that Armstrong failed to act in a timely manner when the statute contains no time limitation but within eight business days he was fired for slamming, and Armstrong was not required to excuse his misconduct once it concluded that he was slamming customers; 2) he cannot state a prima facie case of disability discrimination because he was not treated less favorably than a similarly situated non-disabled employee; 3) he cannot state a prima facie case of retaliation discrimination because he was flagged for slamming two days before he requested a different seat and thus he cannot make a causal connection, and the vice president who made the decision to terminate him had no knowledge of his accommodation request; and 4) even if he could establish a prima facie case of disability or retaliation discrimination, Armstrong had a legitimate, non-discriminatory reason for terminating him (i.e., his acts of slamming customers) and he fails to present evidence of pretext.

Plaintiff argues that: 1) the request he made in March 2014 was the fourth request for an accommodation—Armstrong has ignored the evidence of the three prior requests—and Jobe and Spinetti were unaware of any alleged "misconduct" until March 13, 2014 when they searched his calls looking for an excuse to terminate his employment; 2) he does not have to point to similarly situated non-disabled employees, but can establish an inference of discrimination by pointing to circumstances which give rise to such an inference, such as Toomey's initial assessment of the March 5, 2014 call (stating merely that it "needed improvement") when contrasted with Jobe's reaction to it (that it constituted slamming and required his immediate dismissal), the timing of the investigation immediately after he submitted a doctor's note supporting his request to be moved, Jobe's financial incentive to remove employees who have more unanswered calls,

Armstrong's failure to follow its own standard progressive discipline policy and Jobe's unilateral act of terminating him with a mere "rubber stamp" of approval from Vice President Dickerhoof, and these actions further provide evidence that Armstrong's so-called reason was actually a pretext for unlawful disability discrimination; and 3) this same evidence also supports his claim of retaliation discrimination.

In a reply brief, Defendant argues that: 1) Plaintiff has misrepresented the record, which establishes that Toomey first flagged his call as problematic on March 5, 2014, that she told Spinetti who contacted Jobe and further investigated and found four examples of slamming and that Dickerhoof testified that she listened to at least two of them; 2) the failure to accommodate claim fails because Armstrong did attempt to accommodate his requests for a change of seat and he cannot rely on his own opinion that the seat he received in January 2014 was not quieter, nor can he dispute that his additional request had just been made when he was terminated in March 2014 because of an ongoing investigation into possible slamming; and 3) similarly, his argument about timing for retaliation purposes is contradicted by the record, which demonstrates that Toomey flagged the call on March 5, Spinetti heard it on March 6, Jobe investigated it on March 7, all before his doctor's note was submitted, and Armstrong was not required to confront him with the investigation or to apply progressive discipline when it found repeated acts of slamming.

Disability Claims

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42

U.S.C. § 12112(a).  Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity…."  42 U.S.C. § 12112(b)(5)(A).  An employer's adverse employment action because of an employee's disability and the employer's failure to accommodate the employee's disability are distinct actions that can form the basis of separate claims.  See Colwell v. Rite Aid Corp., 602 F.3d 495, 503 (3d Cir. 2010) (analyzing employee's constructive discharge claim separately from her failure to accommodate claim).  Discrimination on the basis of disability is also prohibited by the PHRA.  43 P.S. § 955(a).

Failure to Accommodate Claims

The Court of Appeals has stated that:

applicable regulations provide that in order "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3).

Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. § 1630, app. 1630.9 at 359.

In Mengine v. Runyon, we held that "both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith." 114 F.3d 415, 420. In Taylor v. Phoenixville Sch. Dist., we concluded that the interactive process must include sufficient notice to inform the employer that an employee is requesting an accommodation followed by good faith participation of the employer and employee in that interactive process. 184 F.3d 296, 319-20 (3d Cir. 1999). "[T]he purpose of the interactive process is to determine the appropriate accommodations: '[t]his process should identify the precise

limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.'" <u>Id.</u> at 316. "When the interactive process works well, it furthers the purposes of the ... ADA." <u>Mengine</u>, 114 F.3d at 420. It may, in fact, not only lead to identifying a specific accommodation that will allow a disabled employee to continue to function as a dignified and valued employee, it may also help sensitize the employer to the needs and worth of the disabled person. It therefore furthers the interest of the employer, and the dignity and humanity of the disabled employee.

<u>Conneen v. MBNA Am. Bank, N.A.</u>, 334 F.3d 318, 329-30 (3d Cir. 2003).

The Court of Appeals has held that:

an employee who tries to hold his/her employer responsible for a breakdown in the interactive process under the ADA must show:

1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

<u>Id.</u> at 330-31 (citing <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d at 319-20).

In this case, there is no dispute that Armstrong knew about Plaintiff's disability or that he requested a quieter working area (preferably a cubicle) and Armstrong does not dispute that he could have reasonably been accommodated if he was provided with a quieter working area, nor does it contend that accommodating him in this way would have imposed an undue hardship on it. The dispute in this case is whether Armstrong made a good-faith effort to accommodate him, and as to this question, there are disputed genuine issues of material fact.

Armstrong argues that it did attempt to accommodate Plaintiff by placing him in what it considered to be a quieter workspace in January 2014. It also argues that there is no time limit for an employer to respond and that the EEOC's own procedures allow 10 business days for an employer to begin the discussion once it receives a request for accommodation and within 8 business days of his request he had been terminated for slamming. Finally, it contends that it had no duty to suspend its ongoing investigation for slamming when it received his March 7, 2014

letter requesting an accommodation. However, it cites no case (and this Court is unaware of any cases) that apply the EEOC's internal standard to a private employer. More significantly, these arguments all assume that Plaintiff's March 7, 2014 request was the beginning of the process, when the record demonstrates that Plaintiff had been asking to be moved since December 2013.

The parties vigorously dispute whether the seat he was given in January 2014, next to the breakroom with the TV, was a quieter workspace or not. But this is not the appropriate standard and this Court is not required to determine whether Plaintiff was moved to a quieter space in January 2014.

Rather, the facts (both undisputed and, as to the disputed ones, those taken in Plaintiff's favor as the non-moving party) demonstrate that: 1) in December 2013, Plaintiff requested a quieter seat and stated his preference for a cubicle, but Armstrong did not move him to a cubicle nor did it ask him if the new space met his needs; 2) when he was moved in January 2014, he immediately told his supervisor that the new workspace was not quieter, yet nothing occurred; 3) he reiterated this concern on January 27, 2014 at a meeting with Mr. Spinetti, but again nothing occurred for over a month thereafter; 4) he obtained a doctor's note supporting his need for a quieter workspace (which he was not required to do) on March 6, 2014 and presented it the next day; and 5) shortly thereafter, he was investigated for alleged acts of slamming and ultimately terminated from his position with Armstrong. Under these circumstances, it cannot be said that Armstrong's actions demonstrated a good-faith effort to accommodate Plaintiff's disability by moving him to a quieter workspace. Although Armstrong was not obligated to move Plaintiff to a cubicle, it has not articulated any reason why it could not have done so. Moreover, even if Mr. Jobe and Mr. Spinetti honestly believed that the space to which they moved Plaintiff in January 2014 was quieter, the fact that he immediately notified M Mr. Spinetti that the space was not

quieter and the lack of their response to his continuing requests to be moved for approximately

two months (from the date of the move in January until March 7, 2014) hardly satisfies the good-

faith effort on their part. As far as the interactive process is concerned, it appears that Plaintiff

continued to engage in it, but his employer did not. Therefore, with respect to the failure to

accommodate claims in Count I, Defendant's motion for summary judgment will be denied.

Disability Discrimination Claims

Plaintiff alleges that Defendant discriminated against him on the basis of his disability, in

violation of both the ADA and the PHRA, by terminating his employment under the guise of an

investigation into his alleged slamming of customers. Defendant contends that Plaintiff's claims

do not meet the necessary standards to survive summary judgment.

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie

case of discrimination indirectly following the shifting burden analysis set forth by the Supreme

Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas

Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). This model,

originally applied in Title VII cases, also applies to claims under the ADA. See Gaul v. Lucent

Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998). Employment discrimination claims under

the PHRA also follow the McDonnell Douglas format. See Rinehimer v. Cemcolift, Inc., 292

F.3d 375, 382 (3d Cir. 2002).

If the employee presents a prima facie case of discrimination, the employer must

"articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the

employee must have an opportunity to prove the employer's reason for the adverse employment

action was a pretext for unlawful discrimination.  Id. at 804.  The Court of Appeals for the Third

Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's
> proffered  legitimate  reasons must allow a factfinder to reasonably infer that each
> of the employer's proffered non-discriminatory reasons was either a post hoc
> fabrication or otherwise did not actually motivate the employment action  (that is,
> the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

### Prima Facie Case of Disability Discrimination

The Court of Appeals has stated that:

> To establish a prima facie case of discrimination under the ADA, a plaintiff must
> ... show "(1) he is a disabled person within the meaning of the ADA; (2) he is
> otherwise qualified to perform the essential functions of the job, with or without
> reasonable accommodations by the employer; and (3) he has suffered an
> otherwise adverse employment decision as a result of discrimination."

Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004) (quoting

Taylor, 184 F.3d at 306).

Defendant argues that Plaintiff cannot state a prima facie case of disability discrimination

because under the third prong, he was not subjected to an adverse employment action as a result

of disability discrimination.  Rather, it contends, the evidence in this case reveals that there was

no animosity against him at any time since his diagnosis in 2011, and it supports the conclusion

that his termination was the result of an investigation into acts of slamming.  Plaintiff contends

that the investigation was instigated by Mr. Jobe to justify his decision to eliminate an employee

who needed further accommodations and days off to treat his condition.

Defendant is attempting to force Plaintiff to prove that he was discriminated against in

order to state a prima facie case.  In other words, Defendant has referenced its proffered reason

for Plaintiff's termination in the course of articulating why he cannot state a prima facie case of

discrimination.  To require Plaintiff to rebut this reason in order to establish a prima facie case of

discrimination improperly imports into the prima facie analysis the later stages of the <u>McDonnell Douglas</u> test.

> As cogently explained by the Sixth Circuit:

> a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

<u>Wexler v. White's Furniture, Inc.</u>, 317 F.3d 564, 574 (6th Cir. 2003) (en banc) (citing <u>Cline v. Catholic Diocese of Toledo</u>, 206 F.3d 651, 660-61 (6th Cir. 2000)). <u>See also</u> <u>Thomas v. Denny's, Inc.</u>, 111 F.3d 1506, 1510 (10th Cir. 1997) ("relying on a defendant's reasons for the adverse employment action as a basis for ruling against a plaintiff at the prima facie stage raises serious problems under the <u>McDonnell Douglas</u> framework because it frustrates a plaintiff's ability to establish that the defendant's reasons were pretextual."); <u>Davenport v. Riverview Gardens Sch. Dist.</u>, 30 F.3d 940, 944 (8th Cir. 1994) ("by requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment action–in other words, to prove pretext and the ultimate issue of intentional discrimination. The prima facie case is not so onerous.") Therefore, Plaintiff has stated a prima facie case of disability discrimination.

<u>Defendant's Proffered Reason and Plaintiff's Evidence of Pretext</u>

The burden of production shifts to Defendant to point to a legitimate, non-discriminatory reason for terminating Plaintiff's employment. It describes the investigation of calls that led to the conclusion that Plaintiff had engaged in acts of slamming. Defendant has thus satisfied its relatively light burden of production. <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 500-01 (3d Cir. 1997).

Plaintiff argues that this proffered reason is a pretext for unlawful disability discrimination and proceeds along "Fuentes prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

Plaintiff argues that Armstrong did not follow its usual practice of counseling an employee, nor did it utilize its progressive discipline policy, but instead took the unprecedented action of conducting a full-scale investigation of his calls and then firing him, all without speaking to him. A company's failure to follow its own policy with respect to other similarly situated individuals can constitute pretext. Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005). Nevertheless, "[i]In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998) (citation omitted).

Plaintiff cannot compare himself to any other Armstrong employee because he does not dispute Armstrong's assertion that he is the only employee ever investigated for slamming. See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 646 (3d Cir. 2015) (nurse practitioner admitted that there were no younger employees who used profanity or yelled at their superiors and thus she could not claim that she was treated less favorably based on her age). In addition, although Plaintiff points to Armstrong's progressive disciplinary policy to suggest that he should have received some lesser sanction, he cannot deny that the policy indicates (Ace Dep.

Exs. 22, 45) that repeated acts of slamming can result in termination and that, in Armstrong's view of the circumstances, he did engage in repeated acts of slamming.

Plaintiff focuses extensively on Ms. Toomey's evaluation of the call with L.M. as "developing" instead of "insufficient." But she testified that "this call was really not appropriate, what happened here, but I left it as a developing until when Jason [Spinetti] and I had a discussion the following day." (Toomey Dep. 57.) She further testified that she has reviewed many calls over the years and that this was the most blatant example of slamming she had ever heard. (Toomey Dep. 52.) Further, she testified that she told Mr. Spinetti "there's something really wrong with this call." (Toomey Dep. 63-64.) And when Mr. Spinetti returned to tell her that he and Mr. Jobe had listened to the call and believed it was a clear-cut example of slamming, she told him that she agreed because "services were added that weren't discussed." (Toomey Dep. 70.)

The Court of Appeals has held that, to discredit the employer's proffered reason, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765 (citations omitted). The Court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [anti-discrimination statutes do] not interfere." Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted). Thus, even if Armstrong was overly harsh in terminating Plaintiff's employment as opposed to imposing some lesser sanction, or if failed to give him every benefit of the doubt by

not discussing the matter with him, this would not demonstrate that it acted out of discriminatory animus.

Thus, the parties' extensive recitation of disputed facts as to whether Plaintiff actually engaged in slamming with respect to the four calls identified by Armstrong is irrelevant. Rather, the issue is whether Plaintiff has pointed to sufficient evidence from which the trier of fact could conclude that Armstrong's proffered reason for his termination was a pretext for unlawful disability discrimination. See Willis, 808 F.3d at 648 (plaintiff failed to proffer evidence of pretext by arguing that she did not really yell during an incident cited by the employer; the issue was whether her supervisor believed that she treated staff members inappropriately).

Plaintiff has failed to meet this burden. The facts of record (again, the undisputed ones and, as to the disputed ones, those construed in Plaintiff's favor as the non-moving party) demonstrate the following: 1) on March 5, 2014, Ms. Toomey flagged a call that troubled her enough to notify Mr. Spinetti about it and she testified that she thought at the time that it was a blatant example of slamming; 2) on March 6, 2014, Ms. Toomey asked Mr. Spinetti to review the call and told him "there's something really wrong with this call"; 3) Mr. Spinetti testified that the thought of slamming independently came to his mind, so he decided to bring it to the attention of his supervisor, Mr. Jobe; 4) on or around March 6 or 7, 2014, Mr. Spinetti told Mr. Jobe about the call with L.M., which he described as an incident of slamming, and Mr. Jobe listened to the call and agreed; 5) on or around March 13 and 14, 2014, Mr. Jobe and Mr. Spinetti, together, listened to approximately 30 of Plaintiff's calls and noted two more (with B.T. and N.W.) were examples of slamming, and Mr. Jobe alerted Ms. Dickerhoof, who listened to two calls and compared them to the work orders and agreed that slamming had occurred; 6) Ms. Dickerhoof asked Mr. Jobe to put together a summary for Mr. Walker; 7) on March 15, 2014,

Mr. Jobe and Mr. Spinetti heard a fourth call that they flagged as slamming (with D.M.); 8) on March 18, 2014, Mr. Jobe notified Ms. Dickerhoof about two more calls; 9) on March 19, 2014, Mr. Walker provided his final approval of Plaintiff's termination; 10) on March 20, 2014, Armstrong's president provided his approval; and 11) on March 21, 2014, Plaintiff's employment was terminated.

Plaintiff engages in a lengthy attempt to suggest that Mr. Jobe was motivated by a desire to increase his own bonus by getting rid of an employee who was about to take off more sick days, presumably reducing his productivity. But this version of events depends upon Plaintiff taking a day off on March 10 prior to Mr. Jobe deciding to investigate the matter, when the evidence does not support this conclusion, but rather that Mr. Jobe heard the call and decided to investigate further by March 7. In addition, Mr. Spinetti testified that he keeps track of "unscheduled" sick leave, not FMLA leave, the kind Plaintiff took on March 10. Plaintiff has not explained how the fact that he had accrued forty hours of sick leave at the time of his discharge can constitute evidence of pretext when he had used and been paid for more than that amount the year before. And Plaintiff's absences had no recorded effect on his productivity because he worked many hours of overtime: over 150 hours in 2013 and over a dozen hours in 2014.

Even accepting Plaintiff's version of events, the most that can be said is that Mr. Jobe may have seen the doctor's note on March 7, 2014 before he was notified about Plaintiff's call with L.M. by Mr. Spinetti. But Plaintiff's theory (that Mr. Jobe used the excuse of this ambiguous call to launch a full-scale investigation to manufacture a claim of slamming as the reason to fire him) ignores the facts that: 1) Ms. Toomey and Mr. Spinetti testified that they already believed that the call with L.M. was slamming, Ms. Toomey told Mr. Spinetti "there's

something really wrong with this call" and Mr. Spinetti said he thought it was slamming when he spoke to Mr. Jobe; 2) the doctor's note merely requested that Plaintiff be moved to a quieter seat, a request he had been making for months and which Mr. Jobe and Mr. Spinetti had at least tried to accommodate on one prior occasion; and 3) Ms. Dickerhoof testified that she heard at least two phone calls and independently concluded that they constituted slamming. As Defendant observes, Plaintiff's theory is viable only if Ms. Toomey, Mr. Spinetti, Ms. Dickerhoof and Mr. Walker are all removed from the story, and the record simply does not allow for this strained, convoluted and bizarre version of events. Therefore, with respect to the disability discrimination claims in Count III, the motion for summary judgment will be granted.

Retaliation Claims

In Count II, Plaintiff alleges that Defendant retaliated against him by terminating his employment for requesting an accommodation for his disability. Defendant argues that: 1) he cannot establish a causal link between his protected activity and the adverse employment action; and 2) even if he could state a prima facie case, it has pointed to a legitimate, nondiscriminatory reason for his termination and he has not proffered evidence from which the trier of fact could conclude that it is a pretext for unlawful retaliation discrimination.

Discrimination against an individual who has opposed a practice prohibited by the ADA or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the statute is itself actionable conduct. 42 U.S.C. § 12203(a). The same is true under the PHRA. 43 P.S. § 955(d). The remedies and procedures of Title VII apply to ADA retaliation claims. 42 U.S.C. §§ 12117(a), 12203(c).

The Court of Appeals has held that the prima facie case elements for a claim of retaliatory discrimination are as follows: 1) the plaintiff engaged in activity protected by the anti-

discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action.  Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006).  "Prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation."  Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010) (citation omitted).

The Court of Appeals has stated that:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. See Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir.1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Defendant does not dispute that Plaintiff requested an accommodation by asking to be moved to a quieter seat on March 7, 2014 or that he suffered an adverse employment action when he was terminated shortly thereafter, but it contends that he cannot establish a causal connection between these events.  It argues that Plaintiff's claim depends upon his erroneous timeline in which he was "targeted" because Armstrong did not begin reviewing his calls for slamming until after he submitted a doctor's letter substantiating his request to be moved to a quieter seat on March 7, 2014 and taken another day off on March 10, 2014, but the undisputed evidence demonstrates that this process began two days before the letter was provided.

Plaintiff contends that Mr. Jobe received the letter on March 7, 2014 before he learned (later that day) about the call with L.M. that Ms. Toomey had regarded as "developing" and Mr. Spinetti thought could have been "a mistake" and seized upon the opportunity, that Mr. Jobe departed from normal training protocol and launched an unprecedented investigation into Plaintiff's phone calls without notifying him, that Ms. Dickerhoof approved Mr. Jobe's recommendation to terminate his employment within hours of receiving it and without listening to the calls or conducting her own investigation, and that Mr. Walker likewise approved the recommendation without further review. As explained above, however, Plaintiff's account of the events simply does not comport with the evidence of record. Most significantly, his temporal proximity argument is unsupported because the record indicates that both Ms. Toomey and Mr. Spinetti concluded that the call was slamming before Plaintiff gave the doctor's note to Mr. Jobe and Ms. Dickerhoof (who had no knowledge of Plaintiff's accommodation request) independently came to the same conclusion.

He also cites a "pattern of antagonism" relating back to Mr. Spinetti's failure to honor his request to be moved to a full cubicle in January 2014. As explained above, this evidence is sufficient for his failure to accommodate claim, but Plaintiff cannot relate it to the events that began to unfold in March 2014 when Ms. Toomey (who was not involved in the accommodation requests) flagged his call with L.M. as potential slamming and Mr. Spinetti agreed. In addition, Plaintiff cites no authority (and this Court is aware of none) that equates an employer's failure to engage in the interactive process regarding an employee's request for accommodation with a "pattern of antagonism."

Moreover, even assuming that Plaintiff could state a prima facie case of retaliation, Defendant has proffered a legitimate, non-discriminatory reason for terminating his employment

and, as detailed above with respect to the disability discrimination claim, Plaintiff has not met his burden of pointing to evidence of pretext. The motion for summary judgment will be granted with respect to the retaliation claims in Count II.

Therefore, Defendant's motion for summary judgment will be granted as to the disability and retaliation discrimination claims in Counts II and III, but denied as to the failure to accommodate claims in Count I.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL ACE,                          )
                    Plaintiff,        )
                                      )
        vs.                           )        Civil Action No. 14-526
                                      )
ARMSTRONG UTILITIES, INC.,            )
                    Defendant.        )

ORDER

AND NOW, this 25th day of February, 2016, for the reasons provided in the

Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (ECF No.

52) is granted with respect to Counts II, III, IV and V of the Amended Complaint and the

Rehabilitation Act claim in Count I, and denied with respect to the failure to accommodate

claims under the ADA and PHRA in Count I.


                                s/Robert C. Mitchell
                                ROBERT C. MITCHELL
                                United States Magistrate Judge